1          IN THE UNITED STATES DISTRICT COURT

2          IN AND FOR THE DISTRICT OF DELAWARE

3                      -   -   -

4    SURGIQUEST, INC.,                )     Civil Action
                                      )
5              Plaintiff,             )
               Counterdefendant,      )
6         v.                          )
                                      )
7    LEXION MEDICAL, LLC,             )
                                      )
8              Defendant,             )
               Counterplaintiff.      )     No. 14-382-GMS
9                      -   -   -

10
                     Wilmington, Delaware
11                   Tuesday, April 11, 2017
                     Day 7 of Jury Trial
12                      10:35 a.m.

13                      -   -   -

14   BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J.,
                                      and a Jury
15

16   APPEARANCES:

17           DENISE S. KRAFT, ESQ.
             DLA Piper LLP
18                 -and-
             FRANCIS W. RYAN, ESQ., and
19           ERICA PASCAL, ESQ.
             DLA Piper LLP
20           (New York, NY)
                   -and-
21           MELISSA REINCKENS, ESQ.
             DLA Piper LLP
22           (San Diego, CA)

23                            Counsel for Plaintiff

24

25

1   **APPEARANCES CONTINUED:**

2           DAVID E. MOORE, ESQ., and
            BINDU PALAPURA, ESQ.
3           Potter Anderson & Corroon LLP
                      -and-
4           DAVID G. WILLE, ESQ.,
            MEGAN LaDRIERE, ESQ., and
5           PAUL J. REILLY, ESQ.
            Baker Botts LLP
6           (Dallas, TX)

7                           **Counsel for Defendant**

8                           -  -  -

:27:16    1                    THE COURT:  Good morning.

:27:17    2                    (Counsel respond "Good morning.")

:27:17    3                    THE COURT:  Please, take your seats.  We won't

:27:21    4    be long together.

:27:22    5              I think Ms. Felice has just sent you the

:27:25    6    relevant sections of the instructions that we have revised.

:27:29    7                  How long do you think it will take you to turn

:27:31    8    that around?

:27:32    9                    MR. RYAN:  We are in the process of doing it

:27:34   10    now.  Maybe 20 minutes, 25 to 30 minutes.

:27:37   11                    MS. KRAFT:  I think it will take a little less

:27:40   12    than that.  We need to get the damages section.  Thank you,

:27:42   13    Your Honor.

:27:43   14                    THE COURT:  Perhaps we can expect to come back

:27:46   15    out at roughly quarter of?  Is that too aggressive?

:27:50   16                    MS. KRAFT:  I would say just give us till ten

:27:55   17    minutes to 11.

:27:56   18                    THE COURT:  Do you want to say 11?

:27:58   19                    MS. KRAFT:  11:00 o'clock is fine, Your Honor,

:28:02   20    just to be sure.  I think we could have it done a little

:28:07   21    sooner.

:28:08   22                    THE COURT:  As soon as they are done, you will

:28:11   23    knock and let us know.  Somewhere between 10:45 and 11 we

:28:16   24    will get out.

:28:17   25                  The reason I came out was to discuss with you

:28:19    1    the length.  I am going to put time limits on your closings.

:28:23    2    I would like to hear from both sides as to how much time you

:28:27    3    would like to have and I will let you know how much time you

:28:30    4    are going to get.

:28:32    5              MR. WILLE:  Your Honor, we would like an hour

:28:33    6    and 15 minutes.

:28:36    7              MR. RYAN:  We will be less than an hour, Your

:28:39    8    Honor.

:28:39    9              THE COURT:  You have got 45 minutes a side --

:28:41   10    you are going to need -- let's talk about this.  Who gets

:28:46   11    rebuttal?  Have you arrived at a protocol, at a treaty on

:28:53   12    this?

:28:53   13              MR. WILLE:  Your Honor, we haven't.  We both

:28:59   14    have claims.  I frankly would be fine if we just delivered

:29:02   15    it with no rebuttal for either side.

:29:04   16              MR. RYAN:  I agree, Your Honor.

:29:06   17              THE COURT:  At last we have an agreement.

:29:10   18    Hallelujah.  That is fine.

:29:13   19              I probably misspoke at the outset.  This is not

:29:15   20    an advisory jury.  This is a jury trial.  I will handle the

:29:21   21    equitable matters that I must, disgorgement, that kind of

:29:26   22    thing.  But Lexion is entitled to present this to the jury.

:29:33   23    It is impossible to separate out many of the factual issues

:29:36   24    that are going to have to be decided upon.

:29:40   25              My point to you is I am not going to be making

:29:45   1   Rule 52 findings of fact and conclusions of law in this

:29:47   2   case.   This is going to be a jury verdict.

:29:51   3                   Anybody want to add anything?

:29:55   4                   MR. WILLE:   No, Your Honor.

:29:56   5                   MR. RYAN:   No, Your Honor.

:29:57   6                   THE COURT:   Anything else?   Because the next

:30:00   7   time we come out I am going to instruct the jury.

:30:03   8                   MR. WILLE:   Your Honor, we are playing one of

:30:05   9   the video exhibits right at the beginning of our closings.

:30:13   10  If the sound could be set so that the sound can be heard?

:30:17   11                  THE COURT:   I leave that to you folks.   You have

:30:22   12  a very competent IT person.

:30:26   13                  MR. WILLE:   The second question, Your Honor, can

:30:28   14  we move the podium and position it like we did?

:30:31   15                  THE COURT:   Sure.   Facing the jury, absolutely.

:30:33   16                  The only guidance I have now, you can venture

:30:36   17  from the podium, don't crowd the jury box.   Okay?   That

:30:41   18  middle pedestal in SurgiQuest's desk is probably as close as

:30:49   19  you need to get.

:30:52   20                  Do you want me to give you a five-minute warning

:30:54   21  when you have five minutes left?

:30:56   22                  MR. WILLE:   Mr. Barnes has a timer here.   I will

:31:00   23  have him set the timer, and I think that's fine.

:31:03   24                  MR. RYAN:   We will do the same, thank you.

:31:05   25                  THE COURT:   We will see you shortly.

| | | |
|---|---|---|
| :31:07 | 1 | (Recess taken.) |
| :16:33 | 2 | THE COURT:  Mr. Buckson. |
| :16:38 | 3 | (Jury enters courtroom at 11:15 a.m.) |
| :16:46 | 4 | THE COURT:  Good morning. |
| :16:49 | 5 | (Jurors respond "Good morning.") |
| :16:50 | 6 | THE COURT:  Please, take your seats. |
| :16:59 | 7 | On behalf of the Court and the parties, I want |
| :17:01 | 8 | to apologize for the delay.  You were here bright and early |
| :17:05 | 9 | and on time as usual.  We weren't quite ready for you.  But |
| :17:09 | 10 | we are now. |
| :17:10 | 11 | Everyone should have your own set of jury |
| :17:14 | 12 | instructions and a verdict form. |
| :17:17 | 13 | As with the preliminary instructions, it's up to |
| :17:22 | 14 | you how you want to follow along.  You will notice for those |
| :17:27 | 15 | of you who are reading that I will sometimes deviate a |
| :17:31 | 16 | little bit from the language.  But I won't deviate from the |
| :17:36 | 17 | meaning that I have to say. |
| :17:38 | 18 | A quick example of that, and sometimes I find, I |
| :17:43 | 19 | come upon things in the instructions, in the mad dash to try |
| :17:47 | 20 | to get these ready for you, I find little typos and things |
| :17:51 | 21 | that need to be amended.  The last two pages are one such |
| :17:56 | 22 | example, entitled Deliberation and Verdict, where you will |
| :18:00 | 23 | see that the current format has an instruction on the second |
| :18:05 | 24 | page that advises you that Juror No. 1 is typically the |
| :18:08 | 25 | foreperson.  That's not the case.  But I will correct that |

:18:14   1   when we get there.

:18:16   2           So ultimately, it's the paper and the words that

:18:20   3   are coming out of my mouth that you need to follow.

:18:33   4           Good morning, members of the jury.

:18:35   5           Again, it is the time for me to instruct you

:18:37   6   about the law that you must follow in deciding this case.

:18:41   7           Now, as you know, each of you has been provided

:18:44   8   a copy of these instructions.  We have already gone through

:18:47   9   that.  I am going to start these instructions by explaining

:18:50   10  your duties and the general rules that apply in every civil

:18:54   11  case.

:18:55   12          Then I will explain some rules that you must use

:18:57   13  in evaluating particular testimony and evidence.

:19:00   14          I will explain the positions of the parties and

:19:01   15  the law you will apply in this case.

:19:04   16          Finally, I will explain the rules that you must

:19:07   17  follow during your deliberations in the jury room and the

:19:11   18  possible verdicts you may return.

:19:13   19          I fully expect -- are both counsel planning to

:19:17   20  discuss the verdict forms in your closings?

:19:19   21          MR. WILLE:  No.

:19:21   22          THE COURT:  Mr. Ryan is, Mr. Wille is not.

:19:23   23          It is my view that the verdict form is

:19:26   24  self-explanatory and certainly, as I will inform you later

:19:29   25  on, if you have questions, you will be able to ask them.

:19:32   1   But you will hear from Mr. Ryan at least on this particular

:19:36   2   matter.

:19:37   3          Please listen carefully to everything I have to

:19:41   4   say.

:19:41   5          Members of the jury, it is important that you

:19:43   6   bear in mind the distinction between your duties and mine.

:19:46   7   You have two main duties as jurors.  The first one is to

:19:49   8   decide what the facts are from the evidence that you saw and

:19:52   9   heard here in this courtroom.  You are the sole judges of

:19:56   10  the facts.  It is your judgment, and your judgment alone, to

:20:00   11  determine what the facts are, and nothing that I have said

:20:03   12  or done during the trial was meant to influence your

:20:06   13  decision about the facts in any way.

:20:11   14         The second is to take the law that I give to

:20:13   15  you, apply it to the facts, and decide if, by a

:20:16   16  preponderance of the evidence, the defendants are liable.

:20:21   17         Now, as far as my duty is concerned, I have the

:20:25   18  duty of advising you about the law that you should apply to

:20:27   19  the facts as you find them.  You are not to consider whether

:20:31   20  the principles I state to you are sound or whether they

:20:34   21  accord with your own views about policy.  You are bound by

:20:39   22  the oath that you took at the beginning of the trial to

:20:42   23  follow the instructions that I give you, even if you

:20:44   24  personally disagree with them.  You must accept them despite

:20:47   25  how you feel about their wisdom or lack thereof.  This

:20:51    1    includes the instructions that I gave you before and during

:20:56    2    the trial and these instructions as well.  All the

:20:58    3    instructions are important, and you should consider them

:21:00    4    together as a whole.

:21:02    5             Perform these duties fairly.  Do not let any

:21:05    6    bias, sympathy or prejudice that you may feel toward one

:21:09    7    side or the other influence your decision in any way.

:21:13    8             Evidence.

:21:14    9             You must make your decision based only on the

:21:16   10    evidence that you saw and heard here in Court.  Do not let

:21:20   11    rumors, suspicions, or anything else that you may have seen

:21:24   12    or heard outside of Court influence your decision in any

:21:27   13    way.

:21:27   14             The evidence in this case includes only what the

:21:29   15    witnesses said while they were testifying under oath, the

:21:32   16    exhibits that I allowed into evidence, and the stipulations

:21:35   17    to which the lawyers may have agreed.

:21:38   18             Nothing else is evidence.  The lawyers'

:21:40   19    statements and arguments are not evidence.  The arguments of

:21:43   20    the lawyers are offered solely as an aid to help you in your

:21:48   21    determination of the facts.

:21:49   22             Their questions and objections are not evidence.

:21:51   23    My legal rulings are not evidence.  My comments and

:21:54   24    questions are not evidence.

:21:55   25             During the trial I may not have let you hear the

:22:01  1  answers to some of the questions the lawyers asked.  I may

:22:04  2  have also ruled that you could not see some of the exhibits

:22:07  3  that the lawyers wanted you to see.  You must completely

:22:10  4  ignore all of these things.

:22:13  5          Do not speculate about what a witness might have

:22:15  6  said or what an exhibit might have shown.  These things are

:22:18  7  not evidence, and you are bound by your oath to not to let

:22:22  8  them influence your decision in any way.

:22:24  9          Make your decision based on the evidence as I

:22:27  10  have defined it here, and nothing else.

:22:29  11          You have heard about direct and circumstantial

:22:31  12  evidence.  Direct evidence is evidence like the testimony of

:22:34  13  an eyewitness which, if you believe it, directly proves a

:22:37  14  fact.

:22:39  15          If a witness testified that she saw it raining

:22:42  16  outside and you believed her, that would be direct evidence

:22:45  17  that it was raining.

:22:47  18          Circumstantial evidence is a chain of

:22:49  19  circumstances that indirectly proves a fact.  If someone

:22:53  20  walked into the courtroom this morning wearing a raincoat

:22:56  21  covered with drops of water and carrying a wet umbrella,

:22:59  22  that would be circumstantial evidence from which you could

:23:01  23  conclude if you so chose that it was raining.

:23:04  24          It is your job to decide how much weight to give

:23:08  25  the direct and circumstantial evidence.  The law makes no

:23:10   1   distinction between the weight that you should give to

:23:13   2   either one, nor does it say that one is better than the

:23:16   3   other.  You should consider all the evidence, both

:23:20   4   circumstantial and direct, and give it whatever weight you

:23:24   5   believe it deserves.

:22:27   6        You should use your common sense in weighing the

:22:29   7   evidence.  Consider it in light of your everyday experience

:22:33   8   with people and events, and give it whatever weight you

:22:36   9   believe it deserves.  If your experience tells you that

:22:39   10   certain evidence reasonably leads to a conclusion, you are

:22:41   11   free to reach that conclusion.

:22:45   12        A further word about statements and arguments of

:22:48   13   counsel.  The attorney's statements and arguments are not

:22:52   14   evidence, as I have told you before.  Instead, their

:22:56   15   statements and arguments are intended to help you review the

:22:58   16   evidence presented.  If you remember the evidence

:23:01   17   differently from the attorneys, you should rely on your

:23:06   18   recollection.

:23:06   19        The role of attorneys is to zealously and

:23:09   20   effectively advance the claims of the parties they represent

:23:12   21   within the bounds of the law.  An attorney may argue all

:23:16   22   reasonable conclusions from evidence in the record.  It is

:23:19   23   not proper, however, for an attorney to state an opinion as

:23:22   24   to the truth or falsity of any testimony or evidence.  What

:23:27   25   an attorney personally thinks or believes about the

:23:31  1    testimony or evidence in a case is simply not relevant, and

:23:36  2    you are instructed to disregard any personal opinion or

:23:38  3    belief concerning testimony or evidence that an attorney has

:23:41  4    offered during opening or closing statements, or at any

:23:45  5    other time during the course of these proceedings.

:23:53  6         You are the sole judges of each witness's

:23:55  7    credibility.  You should consider each witness's means of

:23:58  8    knowledge; strength of memory; opportunity to observe; how

:24:02  9    reasonable or unreasonable testimony is; whether it is

:24:05  10   consistent or inconsistent; whether it has been

:24:08  11   contradicted; the witness's biases, prejudices or interests;

:24:12  12   the witness's manner or demeanor on the witness stand; and

:24:15  13   all circumstances that, according to the evidence, could

:24:18  14   affect the credibility of the testimony.

:24:19  15        If you find the testimony to be contradictory,

:24:23  16   you must try to reconcile it, if reasonably possible, so as

:24:27  17   to make one harmonious story of it all.  But if you can't do

:24:31  18   this, then it is your duty and privilege to believe the

:24:34  19   testimony that, in your judgment, is most believable and

:24:37  20   disregard any testimony that, in your judgment, is not

:24:40  21   believable.

:24:40  22        In determining the weight to give to the

:24:44  23   testimony of a witness, you should ask yourself whether

:24:47  24   there is evidence tending to prove that the witness

:24:49  25   testified falsely about some important fact, or, whether

:24:53    1    there was evidence that at some other time the witness said

:24:57    2    or did something, or failed to say or do something that was

:25:00    3    different from the testimony he or she gave at trial.  You

:25:03    4    have the right to distrust such witness's testimony in other

:25:07    5    particulars and you may reject all or some of the testimony

:25:10    6    of that witness or give it such credibility as you may think

:25:13    7    it deserves.

:25:14    8         You should remember that a simple mistake by a

:25:18    9    witness does not necessarily mean that the witness was not

:25:20    10   telling the truth.  People may tend to forget some things or

:25:25    11   remember other things inaccurately.  If a witness has made

:25:28    12   a misstatement, you must consider whether it was simply an

:25:32    13   innocence lapse of memory or an intentional falsehood, and

:25:37    14   that may depend upon whether it concerns an important fact

:25:40    15   or an unimportant detail.

:25:41    16        Now, this instruction applies to all witnesses.

:25:46    17        Expert testimony, opinion testimony it is still

:25:50    18   called, is testimony from a person who has an essential

:25:54    19   skill or knowledge in some science, profession or business.

:25:58    20   This skill or knowledge is not common to the average person

:26:00    21   but has been acquired by the expert through special study or

:26:03    22   experience.

:26:04    23        Now, in weighing expert testimony, you may

:26:06    24   consider the expert's qualifications, the reasons for the

:26:10    25   expert's opinions, and the reliability of the information

:26:13      1      supporting the expert's opinions, as well as the other

:26:18      2      factors I have previously mentioned for weighing testimony

:26:20      3      of any other witness.  Expert testimony should receive

:26:24      4      whatever weight and credit you think appropriate, given all

:26:28      5      the evidence in the case.

:26:33      6              During this trial, you have heard testimony from

:26:35      7      the playing of videotape excerpts or -- I don't think there

:26:41      8      have been excerpts read into the record.  It has been

:26:43      9      videotape excerpts.  A deposition is the sworn testimony of

:26:46      10     a witness taken before trial.  The witness is placed under

:26:50      11     oath to tell the truth and lawyers for each party may ask

:26:53      12     questions.  The questions and answers are recorded.

:26:56      13     Deposition testimony is entitled to the same consideration

:27:00      14     and is to be judged, insofar as possible, in the same way as

:27:04      15     if the witness testified here in person on the witness

:27:07      16     stand.

:27:10      17             One more point about the witnesses.  Sometimes

:27:12      18     jurors wonder if the number of witnesses who testified makes

:27:14      19     any difference.

:27:15      20             Do not make any decisions, ladies and gentlemen,

:27:17      21     based only on the number of witnesses who testified.  What

:27:19      22     is more important is how believable the witnesses were, and

:27:23      23     how much weight you think their testimony deserves.

:27:27      24     Concentrate on that, not the numbers.

:27:30      25             Now, this is a civil case, as you know.  The

:27:32   1   plaintiff has the burden of proving its claims and damages

:27:35   2   by what is known as a preponderance of the evidence.  Proof

:27:38   3   by a preponderance of the evidence means proof that

:27:40   4   something is more likely true than not.  It means that

:27:43   5   certain evidence, when compared to the evidence opposed to

:27:47   6   it, has the more convincing force and makes you believe that

:27:49   7   something is more likely true than not.

:27:52   8           Preponderance of the evidence does not depend,

:27:55   9   as I have told you, on the number of witnesses.  If the

:27:57   10  evidence as to a particular element or issue is evenly

:28:01   11  balanced, the party has not proved the element by a

:28:06   12  preponderance of the evidence and you must find against that

:28:09   13  party.  In determining whether any fact has been proven by a

:28:12   14  preponderance of the evidence, you may consider the

:28:15   15  testimony of all witnesses, regardless of who called them

:28:18   16  and all exhibits received into evidence regardless of who

:28:21   17  produced them.

:28:22   18          Those of you who are familiar with criminal

:28:25   19  cases will have heard the term proof beyond a reasonable

:28:27   20  doubt.  Now, that burden does not apply in a civil case like

:28:31   21  this and you should therefore put it out of your mind in

:28:33   22  considering whether or not the party bearing the burden of

:28:39   23  proof has met its burden on the various issues.  That would

:28:49   24  be the plaintiff.

:28:49   25          As to false advertising.

:28:50    1              Each party has alleged that the other engaged in

:28:55    2    false advertising under federal law also known as the United

:29:02    3    States Lanham Act.  To be considered false advertising under

:29:05    4    the Lanham Act, there must be a false or misleading

:29:09    5    misrepresentation that is made in commercial advertising or

:29:12    6    promotion, regarding the nature, characteristics, or

:29:16    7    qualities of one's own product or another's product.  For a

:29:20    8    false or misleading statement to violate the Lanham Act, it

:29:24    9    must be "disseminated sufficiently to the relevant

:29:28    10   purchasing public to constitute 'advertising' "or

:29:32    11   'promotion' within the industry."  The level of circulation

:29:37    12   required to constitute advertising and promotion will vary

:29:40    13   from industry to industry and from case to case.  The Lanham

:29:42    14   Act does not mandate the form that such statement must take.

:29:46    15   For example, oral statements by a company's sales

:29:49    16   representatives concerning a product may constitute

:29:51    17   'commercial advertising or promotion' under the Lanham Act

:29:55    18   if disseminated sufficiently to the relevant purchasing

:29:58    19   public within the relevant industry.  Where a number of

:30:01    20   separate, unique communications are made to individual

:30:04    21   customers, but these communications share the same

:30:07    22   competitive approach as part of an organized campaign to

:30:11    23   penetrate the marketplace, you may view the communications

:30:13    24   in the aggregate as a single advertising campaign.

:30:17    25   Similarly, press releases and sales presentations may

:30:21  1    qualify as a commercial advertisement or promotion if they

:30:26  2    are sufficiently disseminated to the relevant purchasing

:30:30  3    public within the relevant industry.

:30:34  4            In some cases, a product name can also qualify

:30:37  5    as a false or misleading statement of fact.  But an omission

:30:40  6    or failure to disclose a fact about a commercial product is

:30:43  7    not considered false advertising under the Lanham Act.

:30:48  8            That said, "To establish a claim for false

:30:51  9    advertising, a Lanham Act plaintiff must prove five

:30:54  10   elements" by a preponderance of the evidence.

:30:57  11           First, that the defendant has made a false or

:31:02  12   misleading statements as to his own product or another's;

:31:06  13           that there is actual deception or at least a

:31:09  14   tendency to deceive a substantial portion of the intended

:31:12  15   audience;

:31:12  16           that the deception is material in that it is

:31:16  17   likely to influence purchasing decisions;

:31:21  18           that the advertised goods traveled in interstate

:31:23  19   commerce; and

:31:25  20           that there is a likelihood of injury to the

:31:27  21   plaintiff in terms of declining sales, loss of goodwill, et

:31:30  22   cetera.

:31:30  23           The burden rests with the plaintiff.  You must

:31:32  24   evaluate the elements for each allegedly false or misleading

:31:35  25   statement.  If a party meets its burden as to any one

:31:38    1    allegedly false or misleading statement by a preponderance

:31:41    2    of the evidence, then you may find the other party engaged

:31:44    3    in false advertising as to that particular statement.

:32:47    4         A party can prevail in a false advertising

:32:50    5    action if it proves that the defendant's advertising

:32:53    6    statement is either (1) false on its face or literally

:32:57    7    false; or (2) literally true or ambiguous, but is still

:33:04    8    likely to mislead and confuse consumers.  There need not be

:33:08    9    a direct comparison to a competitor for a statement to be

:33:10    10    actionable.

:33:11    11         As to literal falsity, in deciding whether an

:33:14    12    advertising claim is literally false, you may decide or must

:33:18    13    decide, first, whether the claim conveys an unambiguous

:33:23    14    message and, second, whether that unambiguous message is

:33:25    15    false.  Only an unambiguous message can be literally false.

:33:30    16    The greater the degree to which a message relies upon the

:33:36    17    viewer to integrate its components and draw the apparent

:33:38    18    conclusion the less likely it is that a finding of literal

:33:41    19    falsity will be supported.  This means, if a statement when

:33:45    20    read in context is ambiguous or susceptible of more than one

:33:50    21    reasonable meaning, it may not be found to be literally

:33:53    22    false .

:33:54    23         In some cases, a false statement is explicit or

:33:58    24    false on its face.  In other cases, a statement is false

:34:03    25    because it necessarily implies other messages that are

:34:06  1   literally false.  A message conveyed by necessary

:34:11  2   implication is one where the audience would consider the

:34:15  3   advertisement in its entirety and would recognize the

:34:19  4   message as being made as readily as if it had been

:34:23  5   explicitly stated.  If an advertising claim is untrue, it

:34:27  6   must be deemed literally false.

:34:29  7        Although the plaintiff normally has the burden

:34:31  8   to demonstrate that the defendant's advertising claim is

:34:34  9   false, you may find that a completely unsubstantiated

:34:37  10  advertising claim by the defendant is per se false without

:34:43  11  additional evidence from the plaintiff to that effect.  The

:34:50  12  message conveyed by an advertising claim must be

:34:52  13  substantiated by sufficiently reliable tests.  The

:34:56  14  sufficiently reliable standard assumes that the test in

:34:58  15  question, if reliable, would prove the proposition or

:35:04  16  propositions for which they are stated.  The party

:35:08  17  challenging an advertising claim has the burden to

:35:11  18  demonstrate by a preponderance of the evidence that the

:35:12  19  advertiser has not proven that its tests were reliable.

:35:16  20        Once a party proves literal falsity of an

:35:20  21  advertising claim, you may presume that all other aspects or

:35:24  22  elements of liability for a false advertising claim have

:35:27  23  been established and you may find the other party liable for

:35:31  24  false advertising without considering the advertising

:35:34  25  claim's impact on the purchases.  But for purposes of

| | | |
|---|---|---|
| :35:37 | 1 | establishing any amount of damages, you must find that the |
| :35:39 | 2 | false advertising caused harm to Lexion.  The foregoing does |
| :35:46 | 3 | not prevent the defendant from offering evidence to rebut |
| :35:49 | 4 | literal falsity. |
| :35:50 | 5 | A plaintiff must prove either literal falsity or |
| :35:56 | 6 | consumer confusion, but not both.  Where literal falsity is |
| :35:59 | 7 | demonstrated, consumer confusion is presumed. |
| :36:02 | 8 | If a party fails to prove that the other party's |
| :36:06 | 9 | advertising statement is literally false, it can still |
| :36:09 | 10 | prevail on a false advertising claim by proving that the |
| :36:12 | 11 | statement is misleading or impliedly false.  A statement is |
| :36:17 | 12 | misleading if it is true or ambiguous but has the tendency |
| :36:20 | 13 | to deceive a substantial portion of consumers.  When a |
| :36:23 | 14 | challenged advertisement is implicitly rather than |
| :36:30 | 15 | explicitly false, its tendency to violate the Lanham Act by |
| :36:36 | 16 | misleading -- its tendency to violate the Lanham Act by |
| :36:43 | 17 | misleading, confusing or -- there is a typo here.  There is |
| :36:53 | 18 | something missing.  Or something is there that shouldn't be |
| :37:05 | 19 | there. |
| :37:08 | 20 | Its tendency to violate the Lanham Act by |
| :37:11 | 21 | misleading, confusing or deceiving what? |
| :37:26 | 22 | MR. REILLY:  Proposed consumers, Your Honor. |
| :37:28 | 23 | MR. RYAN:  It is the relevant consumers. |
| :37:31 | 24 | THE COURT:  You have just heard, amazingly, |
| :37:33 | 25 | agreement by counsel, the parties. |

| | | |
|---|---|---|
| :37:37 | 1 | Ladies and gentlemen of the jury, this should |
| :37:38 | 2 | read, its tendency to violate the Lanham Act by misleading, |
| :37:46 | 3 | confusing or deceiving consumers should be tested by public |
| :37:50 | 4 | reaction. |
| :37:51 | 5 | Agreed, counsel? |
| :37:52 | 6 | MR. RYAN:  Agreed. |
| :37:53 | 7 | MR. REILLY:  Yes, Your Honor. |
| :37:54 | 8 | THE COURT:  If an advertisement or product |
| :37:56 | 9 | literature contains a disclosure that purports to change the |
| :37:59 | 10 | apparent meaning of a claim or render it literally truthful, |
| :38:02 | 11 | but that is so inconspicuously located or in such fine print |
| :38:07 | 12 | that readers tend to overlook it, it will not remedy the |
| :38:10 | 13 | false or misleading nature of the claim. |
| :38:19 | 14 | If a party does not prove an advertising claim |
| :38:22 | 15 | to be literally false, it must prove that it is deceptive or |
| :38:27 | 16 | misleading.  Whether an advertising statement is deceptive |
| :38:30 | 17 | or misleading depends on the message that is conveyed to |
| :38:35 | 18 | consumers.  For you to find that a statement is true but |
| :38:38 | 19 | misleading, the party in the position of the plaintiff must |
| :38:41 | 20 | show that the statement actually deceived or had the |
| :38:44 | 21 | tendency to deceive a substantial segment of the audience. |
| :38:47 | 22 | To put it differently, if a challenged advertisement is not |
| :38:47 | 23 | literally false, a party cannot obtain relief under the |
| :38:53 | 24 | Lanham Act statement by arguing how consumers could react; |
| :38:55 | 25 | it must show how consumers actually do react.  Public |

:39:00    1    reaction is the measure of a commercial impact.   Whether a

:39:04    2    challenged advertising, advertising statement is misleading

:39:07    3    may be proven by evidence of the diversion of sales,

:39:12    4    customer deception, publications, articles, salesperson

:39:17    5    deception, which may be probative to establish customer or

:39:21    6    purchasing deception or other evidence.   You must determine

:39:25    7    whether the purchasing public was in fact misled.

:39:29    8         Evidence of actually confusion is difficult to

:39:32    9    find and even a few incidents may therefore be probative.

:39:36   10         If a party demonstrates that the defendant has

:39:40   11    intentionally set out to deceive the public and its conduct

:39:43   12    in this regard is of an egregious nature, a presumption

:39:47   13    arises that consumers are, in fact, being deceived.

:39:51   14         The plaintiff must also show that defendant's

:39:53   15    misrepresentation is material in that it is likely to

:39:56   16    influence the purchasing decision.   Materiality focuses on

:40:00   17    whether the false or misleading statement is likely to make

:40:03   18    a difference to purchasers.   If a defendant's advertising

:40:05   19    statement is determined to be false, it is presumed to be

:40:08   20    material.   However, the defendant may rebut this presumption

:40:14   21    of materiality by providing sufficient evidence to show, by

:40:17   22    a preponderance of the evidence, that the false statement is

:40:20   23    immaterial to purchasing decisions.

:40:22   24         If a defendant's advertising statement is true

:40:26   25    but misleading, then the plaintiff must show that the

| | | |
|---|---|---|
| :40:28 | 1 | deceptive statement is material and that it is likely to |
| :40:31 | 2 | influence purchasing decisions.  Certain evidence may be |
| :40:34 | 3 | used to show whether or not a false or misleading claim or |
| :40:38 | 4 | claims or statements are material.  Whether a claim or |
| :40:42 | 5 | statement is material can also be shown by demonstrating |
| :40:47 | 6 | that the statement concerns an inherent quality or |
| :40:50 | 7 | characteristic of the product, or because it involves |
| :40:53 | 8 | health, safety, or any other area influential to reasonable |
| :40:57 | 9 | consumers. |
| :41:04 | 10 | A party in a position of the plaintiff must |
| :41:06 | 11 | prove that the advertised products traveled in interstate |
| :41:09 | 12 | commerce.  This element is met if the defendant's products |
| :41:13 | 13 | traveled across state lines.  Here the parties have agreed |
| :41:15 | 14 | that SurgiQuest's products and Lexion's products traveled in |
| :41:21 | 15 | interstate commerce.  Accordingly, neither party need prove |
| :41:24 | 16 | this element. |
| :41:28 | 17 | A plaintiff must prove that it has been injured |
| :41:30 | 18 | or is likely to be injured in terms of declining sales, lost |
| :41:34 | 19 | goodwill, et cetera.  To do this a party asserting a claim |
| :41:37 | 20 | of false advertising must prove, by a preponderance of the |
| :41:40 | 21 | evidence, that an allegedly false or misleading statement is |
| :41:43 | 22 | likely to cause harm.  A party's mere subjective belief that |
| :41:49 | 23 | it is likely to be injured is insufficient to satisfy this |
| :41:53 | 24 | element.  Rather, the party asserting false advertising must |
| :41:58 | 25 | demonstrate in some manner a causal link between the |

:42:02    1   allegedly false or misleading statement and a likelihood of

:42:05    2   harm.   That is to say that the harm allegedly has a

:42:09    3   sufficiently close connection to the conduct the statute

:42:12    4   prohibits.   A plaintiff can establish a causal connection

:42:15    5   with a challenged advertising statement by showing a direct

:42:19    6   diversion of sales or the lessening of goodwill associated

:42:21    7   with the plaintiffs' products.   The causal connection may be

:42:24    8   established by either direct or circumstantial evidence.

:42:28    9           When one party's challenged advertisement

:42:32   10   references the other party's product by name and the party

:42:37   11   asserting a false advertising claim can establish that the

:42:42   12   comparison statements are both deceptive to consumers and

:42:45   13   material, it is presumed that the party has been injured by

:42:50   14   these statements.

:42:52   15           When one party's challenged advertisement

:42:56   16   doesn't explicitly reference the other party's product by

:42:58   17   name, a presumption of injury may still arise if you find,

:43:03   18   by a preponderance of the evidence, that given the nature of

:43:05   19   the market, it would be obvious to consumers that the

:43:07   20   advertisement is targeted at the products of the party

:43:11   21   asserting a false advertising claim even though that party's

:43:15   22   products are not identified by name.

:43:18   23           Each party contends here that the other has

:43:20   24   engaged in deceptive trade practices under the Delaware

:43:25   25   Uniform Deceptive Trade Practices Act.   To prove a violation

| | |
|---|---|
| :43:29 | 1 |
| :43:32 | 2 |
| :43:36 | 3 |
| :43:39 | 4 |
| :43:44 | 5 |
| :43:46 | 6 |
| :43:51 | 7 |
| :43:55 | 8 |
| :43:56 | 9 |
| :44:00 | 10 |
| :44:04 | 11 |
| :44:07 | 12 |
| :44:10 | 13 |
| :44:15 | 14 |
| :44:18 | 15 |
| :44:21 | 16 |
| :44:26 | 17 |
| :44:30 | 18 |
| :44:37 | 19 |
| :44:40 | 20 |
| :44:43 | 21 |
| :44:44 | 22 |
| :44:46 | 23 |
| :44:48 | 24 |
| :44:48 | 25 |

1  of the Delaware Deceptive Trade Practices Act, the party

2  asserting the claim must prove by a preponderance of the

3  evidence that in the course of the other's business it

4  either, first, represents its goods have characteristics,

5  uses or benefits that they do not have;

6          Next, disparages the goods, services, or

7  business or another by false or misleading representation or

8  representations of fact;

9          Next, advertises goods with an intent not to

10  sell them as advertised; or,

11          Finally, engaged in other conduct which creates

12  a likelihood of confusion or misunderstanding.

13          In order to prevail in an action under this

14  chapter, a plaintiff need not prove competition between the

15  parties or an actual confusion or misunderstanding.  The

16  Delaware Deceptive Trade Practices Act is directed at

17  patterns of deceptive conduct, not isolated statements or

18  isolated incidents of consumer fraud.

19          Each party also contends that the other has

20  engaged in unfair competition under the common law of

21  Delaware.

22          The party in the position of the plaintiff

23  asserting this claim must prove by a preponderance of the

24  evidence:

25          First, that the plaintiff had a reasonable

:44:50  1   expectancy of entering a valid business relationship with

:44:54  2   its customers in the form of product sales;

:44:56  3           Next.  The defendant has wrongly interfered with

:44:59  4   the relationships and the defendant's actions have defeated

:45:03  5   the plaintiffs' legitimate expectancy of entering a valid

:45:06  6   business relationship.

:45:10  7           I will now instruct you on the standards for

:45:12  8   monetary relief as they relate to this case.  Only Lexion

:45:16  9   seeks to recover damages in this case, monetarily.  If you

:45:19  10  find for Lexion on any one of its claims of false

:45:23  11  advertising, or you find for Lexion on its claims of unfair

:45:27  12  competition, you must determine the amount of money, if any,

:45:32  13  that Lexion is entitled to be awarded.  I am instructing you

:45:34  14  on monetary relief only so that you have guidance in the

:45:36  15  event you find that SurgiQuest is liable and that Lexion is

:45:39  16  entitled to recovering money from it.  If Lexion has proven

:45:44  17  that Surgiquest has engaged in false advertising or unfair

:45:47  18  competition, then you may award any damage sustained by

:45:48  19  plaintiff, including harm to market reputation, any lost

:45:51  20  sales, or other lost revenue that Lexion has proven by a

:45:58  21  preponderance of the evidence.

:45:59  22          As to lost profits, Lexion claims that it is

:46:02  23  entitled to an award of profits that Lexion claims it lost

:46:05  24  from sales of its Insuflow or Synergy products from 2013

:46:11  25  through trial as a result of false or misleading statements

| | | |
|---|---|---|
| :46:17 | 1 | that SurgiQuest made about the AirSeal product. |
| :46:20 | 2 | For each advertising statement about AirSeal |
| :46:20 | 3 | that you find to be false or misleading, if any, Lexion must |
| :46:21 | 4 | show that the advertising statement was a material factor in |
| :46:25 | 5 | causing Lexion to lose sales in order to recover lost |
| :46:29 | 6 | profits damages in connection with that statement.  Put |
| :46:32 | 7 | differently, to recover its own lost profits, Lexion must |
| :46:36 | 8 | prove by a preponderance of the evidence that its actual |
| :46:40 | 9 | damages were causally related to actual deception of the |
| :46:44 | 10 | purchasing public.  However, this does not place upon Lexion |
| :46:48 | 11 | a burden of proving detailed individualization of lost |
| :46:51 | 12 | sales.  Such proof goes to the amount of damages, not to the |
| :46:55 | 13 | very right to recover.  A causal link can be met with |
| :47:00 | 14 | circumstantial evidence or direct evidence. |
| :47:05 | 15 | If literal falsity is found, Lexion does not |
| :47:05 | 16 | need to prove actual deception of consumers to recover |
| :47:11 | 17 | damages statements made by SurgiQuest.  Additionally, a |
| :47:14 | 18 | finding of intentional willful deception by defendant will |
| :47:17 | 19 | justify a presumption that consumer are, in fact, being |
| :47:22 | 20 | deceived. |
| :47:22 | 21 | Once Lexion establishes SurgiQuest's deceptive |
| :47:24 | 22 | intent, the burden then shifts to SurgiQuest to demonstrate |
| :47:25 | 23 | the absence of customer deception. |
| :47:30 | 24 | Once Lexion establishes that it has been |
| :47:33 | 25 | damaged, it must also provide a reasonable estimate of the |

:47:35  1    amount of damage.  Under the Lanham Act, Lexion's lost

:47:39  2    profits would be calculated by estimating the revenue Lexion

:47:46  3    lost due to SurgiQuest's false or misleading statements

:47:46  4    about the AirSeal product and subtracting out what it would

:47:51  5    have cost Lexion to generate that revenue.  In other words,

:47:54  6    Lexion may prove lost profit damages by showing the amount

:47:59  7    of sales it would have made, but did not make, because of

:48:01  8    SurgiQuest's alleged false advertising and the amount of

:48:05  9    profit that Lexion would have earned on each of those sales,

:48:08  10   net of all operating costs, overhead costs, production

:48:12  11   costs, and other deductible expenses that would have been

:48:16  12   incurred in making those sales.

:48:20  13          Another type of damage that may be recoverable

:48:22  14   are damages for the cost of corrective advertising.  If

:48:26  15   Lexion has proven that SurgiQuest has engaged in false

:48:30  16   advertising or unfair competition, you may award any cost of

:48:33  17   pretrial or posttrial corrective advertising that Lexion has

:48:36  18   proven by a preponderance of the evidence.  The cost of

:48:40  19   correct advertising may include reasonable expenditures made

:48:45  20   by Lexion in order to prevent, correct, or mitigate the

:48:49  21   confusion or deception of past and prospective purchasers

:48:51  22   resulting from SurgiQuest's false advertising or unfair

:48:54  23   competition.

:47:53  24          If you decide to award compensatory damages to

:48:00  25   Lexion for unfair competition under the Delaware Common Law,

:48:05    1    you must determine whether SurgiQuest is also liable to

:48:09    2    Lexion for punitive damages.

:48:10    3            Now, punitive damages are different from

:48:12    4    compensatory damages.  Compensatory damages are awarded to

:48:16    5    compensate the plaintiff or the plaintiffs for the jury

:48:19    6    suffered.  Punitive damages, on the other hand, are awarded

:48:21    7    in addition to compensatory damages.  You may award punitive

:48:24    8    damages to punish a party for outrageous conduct and to

:48:27    9    deter a party, and others like it, from engaging in similar

:48:31    10    conduct in the future.  To award punitive damages, you must

:48:35    11    find by a preponderance of the evidence that SurgiQuest

:48:38    12    acted intentionally or recklessly.  Punitive damages cannot

:48:43    13    be awarded for mere inadvertence, mistake, errors of

:48:47    14    judgment and the like, which constitute ordinary negligence.

:48:49    15            Intentional conduct means it is the person's

:48:52    16    conscious object to engage in conduct of that nature.

:48:55    17    Reckless conduct is a conscious indifference that amounts to

:49:00    18    an "I don't care" attitude.  Reckless conduct occurs when a

:49:04    19    person, with no intent to cause harm, performs an act so

:49:07    20    unreasonable and dangerous that it knows or should know that

:49:10    21    there is an eminent likelihood of harm that can result.

:49:14    22    Each requires that the defendant foresee that its conduct

:49:17    23    threatens a particular material harm to another.

:49:19    24            In determining any award of punitive damages,

:49:21    25    you may consider the nature of SurgiQuest's conduct and the

| :49:24 | 1 | degree to which the conduct was reprehensible.  Finally, you |
| :49:28 | 2 | may assess an amount of damages that will deter SurgiQuest |
| :49:30 | 3 | and others like it from similar conduct in the future.  You |
| :49:36 | 4 | may consider SurgiQuest's financial condition when |
| :49:37 | 5 | evaluating deterrence.  Any award of punitive damages must |
| :49:41 | 6 | bear a reasonable relationship to Lexion's compensatory |
| :49:43 | 7 | damages.  If you find that Lexion is entitled to an award of |
| :49:47 | 8 | punitive damages, state the amount of punitive damages |
| :49:50 | 9 | separately on the verdict form. |
| :49:53 | 10 | Finally, how you conduct your deliberations, |
| :49:56 | 11 | ladies and gentlemen, is up to you. |
| :49:58 | 12 | There is an edit here I am going to impose right |
| :50:01 | 13 | now.  I would suggest that selecting a foreperson at the |
| :50:05 | 14 | outset might facilitate your deliberations. |
| :50:10 | 15 | But, however you conduct those deliberations, |
| :50:13 | 16 | please remember that your verdict must represent the |
| :50:15 | 17 | considered judgment of each juror. |
| :50:16 | 18 | It is your duty, as jurors, to consult with one |
| :50:21 | 19 | another and to deliberate with a view toward reaching an |
| :50:24 | 20 | agreement, if you can do so without violence to your |
| :50:29 | 21 | individual judgment.  Each of you must decide the case for |
| :50:32 | 22 | yourself, but do so only after an impartial consideration of |
| :50:36 | 23 | the evidence with your fellow jurors.  In the course of your |
| :50:38 | 24 | deliberations, do not hesitate to reexamine your own views |
| :50:41 | 25 | and change your opinion, if convinced it is erroneous.  But |

:50:45  1    do not surrender your honest conviction as to the weight or

:50:48  2    effect of evidence solely because the opinion of your fellow

:50:51  3    jurors, or for the purpose of returning a verdict.  Remember

:50:54  4    at all times that you are not partisans.  You are judges --

:50:58  5    judges of the facts, not me.  Your sole interest is to seek

:51:02  6    the truth from the evidence in the case.  In order for you

:51:06  7    as a jury to return a verdict, it is necessary that each

:51:09  8    juror agree to the verdict.  In other words, your verdict

:51:11  9    must be unanimous.

:51:12  10           Now, a form of verdict, as I have told you, has

:51:15  11   been prepared.  You will take this form to the juryroom, and

:51:19  12   when you have reached unanimous agreement as to your

:51:21  13   verdict, you will have your foreperson fill in, sign and

:51:23  14   date the form.  You will then return to the courtroom and

:51:26  15   your foreperson will hand over the form to Mr. Buckson, and

:51:31  16   he will announce your verdict.

:51:32  17           It is proper to add the caution that nothing

:51:35  18   said in these instructions, and nothing in the form of

:51:38  19   verdict is meant to suggest or convey in any way or manner

:51:41  20   any intimation as to what verdict I think you should find.

:51:46  21   What the verdict shall be is your sole and exclusive duty

:51:50  22   and responsibility.

:51:51  23           Now, that concludes the part of my instructions

:51:53  24   explaining the rules for considering the testimony and

:51:55  25   evidence.  Now let me finish up by explaining how you

:51:58   1   communicate questions or messages to the Court.

:52:01   2          Once you start deliberating do you not talk to

:52:03   3   the Jury Officer, to my Deputy Clerk, or to me, or to anyone

:52:06   4   else except each other about the case.  If you have any

:52:09   5   questions or messages, right write them down on a piece of

:52:13   6   paper, have your foreperson sign them and give them to the

:52:15   7   Jury Officer who will be outside your area.  The question

:52:18   8   will be given to me, and I will respond as soon as I can.  I

:52:21   9   may have to talk to the lawyers first about what you have

:52:24  10   requested or asked, so it may take me a bit of time to get

:52:27  11   back to you.

:52:29  12          One more thing I want to say to the jury here.

:52:33  13   Your deliberations will be completely confidential and

:52:35  14   protected.  You should therefore feel free to engage in any

:52:39  15   discussion as vigorous and polite a manner as you so choose,

:52:45  16   or impolite.  The point is that your deliberations are

:52:52  17   completely confidential.

:52:53  18          One more thing about messages.  Do not ever

:52:55  19   write down or tell anyone else how you stand on your votes.

:52:59  20   For example, do not write down or tell anyone else that you

:53:02  21   are split 6-2, or 4-4, or whatever your vote happens to be.

:53:06  22   That should stay secret until your deliberations are

:53:09  23   completed.

:53:09  24          Let me finish by repeating something I said to

:53:12  25   you earlier.  Nothing I have said or done during the course

| | | |
|---|---|---|
| :53:16 | 1 | of this trial was meant to influence your decision in favor |
| :53:19 | 2 | of either party.  You must decide the case yourself based on |
| :53:23 | 3 | the evidence presented. |
| :53:24 | 4 | Okay.  Mr. Wille. |
| :53:26 | 5 | MR. WILLE:  Your Honor, can we have a minute to |
| :53:27 | 6 | get organized here? |
| :53:38 | 7 | THE COURT:  Do any of the jurors need a quick |
| :53:39 | 8 | break?  Okay?  We're all good? |
| :53:43 | 9 | Okay. |
| :53:48 | 10 | (Video played.) |
| :53:53 | 11 | MR. WILLE:  That's not a seal.  And the product |
| :53:57 | 12 | is not essentially equivalent to Insuflow, and the product |
| :54:01 | 13 | does not protect the staff from the dangers of surgical |
| :54:04 | 14 | smoke.  That is really what this case comes down to. |
| :54:07 | 15 | I told you in opening statement that we would |
| :54:09 | 16 | demonstrate false advertising in three different areas and |
| :54:13 | 17 | we have done so.  And we have done so using SurgiQuest's own |
| :54:18 | 18 | witness's testimony and we have done so using SurgiQuest's |
| :54:21 | 19 | own documents. |
| :54:22 | 20 | Let's look at what SurgiQuest knew. |
| :54:26 | 21 | On humidity, December 12, 2010.  Mr. Azarbarzin |
| :54:30 | 22 | signed the 510(k) application which acknowledges that |
| :54:33 | 23 | moisture is removed from the patient.  I'll show this to you |
| :54:36 | 24 | in a minute. |
| :54:36 | 25 | February 22nd, 2012, Ralph Sterns does his |

:54:40   1    humidity testing.  In his memo to the CEO, he states the

:54:46   2    AirSeal dehydrates and chills patient.

:54:48   3            With respect to air, early in 2010, SurgiQuest

:54:52   4    has an engineering specification that has 11 signatures on

:54:56   5    it that says AirSeal sucks air into the abdomen.

:54:59   6            February 22, 2012, Ralph Sterns's test data

:55:04   7    again to the CEO of SurgiQuest.  They know that over

:55:08   8    70 percent air can be in the abdomen during the use of the

:55:10   9    AirSeal system.  And,

:55:11   10           With respect to smoke, Mr. Azarbarzin testified

:55:15   11   that he knew from the beginning that the filter could not

:55:17   12   filter out toxic and carcinogenic gases.

:55:21   13           But what did SurgiQuest advertise?  SurgiQuest

:55:24   14   advertised that AirSeal does essentially the same thing as

:55:28   15   Insuflow.

:55:28   16           They advertise that AirSeal keeps tissues moist

:55:31   17   and eliminates the need for a hater/humidifier.

:55:35   18           With respect to air, they called it an AirSeal

:55:37   19   even though it sucks in air and releases gases into the

:55:40   20   operating room.

:55:41   21           They said it was a carbon dioxide insufflator

:55:45   22   which for decades only delivered carbon dioxide.  This

:55:48   23   delivered carbon dioxide and air.

:55:50   24           They said it maintains stable pneumoperitoneum.

:55:55   25   But it's stable.  The concentration of the carbon dioxide is

:55:57  1   changing when there are leaks and the doctors don't know

:55:59  2   about that.

:55:59  3          With respect to smoke, they said smoke-free

:56:02  4   working environment, smokeless laparoscopy, protects the

:56:06  5   operating room personnel from the dangers of smoke.

:57:07  6          But you have now seen the evidence.  You now

:57:10  7   know that the staff is not protected from the dangers of

:57:12  8   smoke.  If anything, the dangers of smoke are hidden from

:57:15  9   the staff, because they think they are being protected,

:57:18  10  because the particles get taken out of the smoke, but the

:57:21  11  toxic and carcinogenic gasses get released into the

:57:25  12  operating room.

:57:26  13         And what has SurgiQuest reaped?  It sold the

:57:29  14  company to ConMed for 265 million dollars.  Its CEO

:57:35  15  personally got ten million dollars out of this.  And that

:57:38  16  was the plan.  The plan was by 2016 to be on the beach.  Mr.

:57:44  17  Azarbarzin has ten million dollars and if he wanted to be on

:57:45  18  the beach, he certainly could.

:57:47  19         And what has Lexion lost?  Lexion's sales

:57:52  20  increased every year until SurgiQuest's false advertising

:57:56  21  began.  And once SurgiQuest's false advertising began, it

:58:00  22  had a slight increase during 2012 and then its sales started

:58:04  23  to dip.  And they have continued to dip ever since.

:58:08  24         Now, Mr. Ryan in opening statement said

:58:12  25  SurgiQuest told you that this case is about what surgeons

:58:14   1   want.  That is not exactly right.

:58:19   2           I acknowledged to you in opening statement that

:58:21   3   there are some good things about SurgiQuest's product.  It

:58:24   4   does some good things for patients.  But having a product

:58:28   5   that does some good things does not give them license to

:58:32   6   falsely advertise it in other respects.  That is what this

:58:35   7   case is really about.  And I am now going to review the

:58:37   8   evidence for you.  And I am going to apologize in advance.

:58:42   9   I am going to go through some of this evidence pretty fast.

:58:45   10  You are not going to have time to read everything on the

:58:45   11  slides.  My intent is simply to remind you of a lot of

:58:48   12  evidence as it was discussed during the case.  You have seen

:58:50   13  a lot of it multiple times.  I am going to pause at a few

:58:53   14  points.

:58:53   15          Again, I am going to go through it rather

:58:56   16  quickly, in the interests of time.

:59:02   17          Heat and humidity.  Again, the FDA filing, smoke

:59:07   18  and moisture is removed.  They told the FDA they removed

:59:09   19  moisture from the patient.  Mr. Stearns's memorandum, the

:59:13   20  PneumoSure dehydrates the abdominal cavity the most,

:59:17   21  followed by the iFS and then the DPS.  Chilling the patient.

:59:20   22  So they knew these things.  They knew these things back in

:59:24   23  2012.

:59:25   24          Mr. Azarbarzin testified that any humidity in

:59:28   25  the gas that's inside the patient came from the patient.

|       |    |                                                                      |
|-------|----|----------------------------------------------------------------------|
| :59:33 | 1  | Lexion humidifies the gas outside the patient, |
| :59:37 | 2  | delivers humidified gas to the patient.  SurgiQuest robs the |
| :59:41 | 3  | moisture from the patient and dehydrates the patient in the |
| :59:43 | 4  | process. |
| :59:45 | 5  | That's the difference between the products.  And |
| :59:46 | 6  | Dr. Burban's testing showed you that. |
| :59:49 | 7  | Lexion's product adds moisture to the abdomen. |
| :59:52 | 8  | SurgiQuest's product removes moisture from the abdomen. |
| :59:56 | 9  | Dr. Burban also explained to you the flaws in |
| :00:00 | 10 | SurgiQuest's humidity testing, which really proved that the |
| :00:03 | 11 | AirSeal dehydrates and cools the patient more than |
| :00:06 | 12 | conventional insufflators, because all of the moisture |
| :00:11 | 13 | during Mr. Stearns's test that he measured came from the |
| :00:14 | 14 | patient.  That was all evaporated from the patient. |
| :00:19 | 15 | What did SurgiQuest advertise?  Well, they told |
| :00:21 | 16 | their sales reps that AirSeal performs essentially the same |
| :00:25 | 17 | function.  And you have seen plenty of evidence in this case |
| :00:28 | 18 | that the sales reps did exactly what they were trained and |
| :00:30 | 19 | went out and told customers that it performed essentially |
| :00:33 | 20 | the same function. |
| :00:35 | 21 | For example, Mr. Fadem testified that they were |
| :00:39 | 22 | trained to say we have a product that can replace what you |
| :00:41 | 23 | are currently using and does everything of what yours |
| :00:45 | 24 | currently does. |
| :00:46 | 25 | Mr. Ross testified about an e-mail he sent that |

:00:49    1    says the AirSeal system performs essentially the same

:00:52    2    function.  He communicated that to his customer.  And we

:00:57    3    will see more evidence of this as we look at the confusion

:01:00    4    evidence.

:01:00    5          What else did SurgiQuest advertise?  They

:01:03    6    advertised by electronic mail -- and you can believe, if

:01:06    7    they advertised by electronic mail, that there was many more

:01:11    8    oral conversations which went on with their sales reps,

:01:14    9    which also constitute advertising.

:01:16    10          The message in this industry is delivered in

:01:19    11    one-on-one communications.  You heard a lot of testimony

:01:22    12    about that from both sides.  So that's advertising, just

:01:24    13    like any other form of advertising.  And here, there is a

:01:28    14    number of e-mails in the record that they advertised, that

:01:32    15    they keep tissues moist.  And we showed you that there is

:01:36    16    over a hundred e-mails where they said that they keep

:01:39    17    tissues moist.

:01:40    18          Now, they tried to suggest that was only Craig

:01:43    19    Britten, but actually, if you go look at those exhibits,

:01:47    20    Ryan Hatfield, John Simpson, Paul Lozano, Daniel Edwards,

:01:52    21    there is multiple sale reps who made this.  Not only that,

:01:57    22    Mr. Britten testified that he got this information from

:02:00    23    Kevin Yeager, who was his regional manager and then became

:02:03    24    the area director for the entire Western United States for

:02:03    25    SurgiQuest.

:02:08   1          He also testified that that was part of the

:02:10   2   standard e-mail that he sent out.

:02:14   3          Now, these claims are also unsubstantiated.  And

:02:18   4   the Judge gave you some instructions about unsubstantiated

:02:20   5   claims.  Mr. Azarbarzin agrees there is nothing in the

:02:24   6   medical journals and no test that SurgiQuest has performed

:02:27   7   to prove that they keep tissues moist.  So these are

:02:31   8   unsubstantiated false claims.

:02:33   9          They also advertised that the warmer/humidifier

:02:36   10  is not needed.  Now, we expect SurgiQuest will get up and

:02:39   11  will focus you just on the not needed word, take it out of

:02:44   12  the advertising context, and say, well, some doctors

:02:48   13  disagree as to whether heating and humidification is good

:02:52   14  for the patient, so that is an ambiguous statement.

:02:54   15         This is not an ambiguous statement taken in

:02:57   16  context, because the context of the statement says, if you

:03:02   17  are currently using a CO2 warmer/humidifier, which can only

:03:06   18  be the Insuflow because it was the only one sold, you don't

:03:11   19  need it when you use AirSeal.  They are telling the customer

:03:15   20  that they can do the same thing as Insuflow.

:03:16   21         And the context of the line above it further

:03:19   22  supports that, because they also tell the customer, you

:03:22   23  don't need a smoke evacuator.  Well, again, the reason you

:03:26   24  don't need a smoke evacuator is because they claim to

:03:31   25  evacuate smoke.

:03:31  1       So the overall all context of this, there is

:03:33  2  only one reasonable meaning.  They are telling the customer,

:03:37  3  you don't need the Insuflow product because we heat and

:03:42  4  humidify.  But don't take my word for it.  Bryan Davies, a

:03:45  5  sales representative for SurgiQuest, we asked him, the

:03:48  6  reason you don't use a CO2 warmer/humidifier when you use

:03:52  7  AirSeal is because why?  And he testified, Because from our

:03:56  8  experience the AirSeal unit acts in a similar fashion.

:03:59  9  Again, this goes back to what they were trained.  It

:04:01  10  performs essentially the same function.

:04:04  11       You heard from Derrek Smith, who had a customer

:04:08  12  actually point to something about eliminating CO2 warmers

:04:13  13  and humidifiers and saying, well, why do I need to trial

:04:17  14  another product if I already have one that performs that

:04:20  15  job?  So this is a customer looking at this advertisement

:04:23  16  and saying, that is what it meant to them.

:04:26  17       Materiality.  We don't think we have to prove

:04:27  18  materiality because we think we have proven falsity of the

:04:31  19  advertising.  But there is ample evidence of materiality for

:04:35  20  heating and humidification.  Dr. Dulemba testified it was

:04:39  21  very important for him, the heating and humidification

:04:43  22  capability.  You saw the evidence that Dr. Redan put in

:04:47  23  about the health effects to the patient.

:04:50  24       So one of the reasons something may be material

:04:52  25  is because it could impact the health or safety of the

:04:55  1    person that the device is being used on, and you heard that

:05:01  2    evidence from Dr. Redan.

:05:02  3            It is also material because there is market

:05:05  4    demand for heating and humidification, and SurgiQuest, Mr.

:05:05  5    Babini admits that at least 50 percent of the doctors want

:05:11  6    heating and humidification, and that's why he put it in

:05:13  7    customer requirements documents.

:05:16  8            Then, you heard yesterday from Mr. Tegan, a

:05:18  9    couple years later they do another customer survey.  And

:05:21  10   what does Mr. Tegan say?  Well, active humidification is

:05:27  11   highly desirable.

:05:29  12           Confusion.

:05:31  13           Customers were confused.  There is ample

:05:34  14   evidence of confusion.  Dr. Kobza testified that his

:05:37  15   understanding was AirSeal would provide heat and humidified

:05:41  16   air.  You heard from Dr. Dulemba, the sales rep said, yeah,

:05:46  17   does the same thing.  It's almost the same.  And he was

:05:49  18   pretty upset about it later when he found out it didn't do

:05:52  19   the same thing.

:05:54  20           Kristin Huth testified about somebody at Aurora

:05:57  21   Grafton, that they told her that they thought that the

:06:01  22   product heated and humidified.  You heard from Ms. Moriarty

:06:05  23   here in Court.  She identified four different hospitals that

:06:10  24   had told her that the product heated and humidified or did

:06:14  25   the same thing.

:06:16   1          Robert Danielewicz said he had heard doctors and

:06:19   2   nurses tell him the AirSeal heated and humidified.  And

:06:22   3   again, you heard Derrek Smith say, well, we don't need your

:06:27   4   product because we already have AirSeal and that performs

:06:30   5   the same function; and Kristin Huth at another hospital, who

:06:37   6   told her that it heated and humidified.

:06:40   7          Brett Emery, down in Texas, someone from Robotic

:06:46   8   Surgery, said, well, it did the same exact same thing the

:06:50   9   Insuflow and Synergy were doing when talking about the

:06:53   10   AirSeal system.

:06:54   11          Matthew Montano, any customer ever tell you

:06:57   12   this?

:06:57   13          Sure.  They spoke about it in the way it was

:07:01   14   doing the same thing that our product did.

:07:03   15          Even Intuitive Surgical, the maker of the robot,

:07:07   16   was confused.  They said, best of all, so that is relevant

:07:11   17   to materiality as well, it is an important thing they are

:07:15   18   saying, the pneumo is heated and humidified, again,

:07:20   19   incorrect.

:07:20   20          In another area of the country, we had Mr.

:07:24   21   Danielewicz, who met another Intuitive rep in Milwaukee who

:07:27   22   said, he explained how the Insuflow heated and humidified,

:07:30   23   and the Intuitive rep said, oh, so just like the AirSeal.

:07:37   24          In addition to the actual confusion of customers

:07:39   25   and the confusion of the Intuitive reps, there was also

:07:43  1    published confusion.  And published confusion is especially

:07:47  2    important, because it is out there, it is published.  People

:07:50  3    can read it.  So the confusion can be reinforced year after

:07:54  4    year.

:07:55  5           So there was this newsletter that was presented

:07:57  6    by Dr. Redan.  It talks about recirculating the CO2, rather

:08:02  7    than continually adding fresh cold gas.

:08:04  8           But you know from hearing the evidence in this

:08:07  9    case that it actually does add fresh cold gas three to eight

:08:11  10   liters a minute.

:08:12  11          So there is confusion.  And Dr. Redan also

:08:17  12   showed you two articles published by surgeons, actually one

:08:22  13   is an article and one is a treatise, where they believed

:08:26  14   that the Insuflow was heating the gas.

:08:28  15          So there is lots of confusion out there

:08:28  16   engendered by SurgiQuest's false advertising.

:08:31  17          Now let's talk about air.  The AirSeal does not

:08:35  18   seal.  The AirSeal sucks air into the abdomen.  That's what

:08:38  19   their engineering specification says.  So it doesn't seal

:08:42  20   out, lets over 70 percent air in.  You saw Dr. Burban's

:08:49  21   test, the Aspen test, the NAMSA test, they are all

:08:54  22   consistent.  It sucks in a lot of air when there is a

:08:54  23   significant leak.

:08:59  24          Ralph Stearns also testified that it doesn't

:09:01  25   seal it in, either.  Gas and smoke can escape out the top of

:09:06    1    the trocar.

:09:08    2         The first false statement is the name of the

:09:11    3    product itself, AirSeal.   That conveys, that makes a false

:09:13    4    statement about the product to the customer.   The customer

:09:16    5    believes no air gets in on or out.   And you have seen

:09:21    6    evidence in this case that customers actually believe.

:09:23    7         Now, Dr. Collins testified yesterday about his

:09:26    8    patent.   And the importance of this is that trocars have had

:09:30    9    seals for years.   So surgeons know what seals are.   Those

:09:35    10   seals preclude the passage of gas, that is what their

:09:38    11   purpose is.

:09:39    12         So when you tell a customer you have an AirSeal,

:09:43    13   they think that no air gets in or out.   And we are going to

:09:46    14   show you the evidence of that.

:09:48    15         They also say that there is unmatched

:09:51    16   performance in the maintenance of stable pneumoperitoneum,

:09:54    17   but it's not stable.   Again, the concentration of the CO2

:10:00    18   changes.

:10:01    19         You have seen a couple of definitions of stable

:10:04    20   pneumoperitoneum.   This is SurgiQuest's definition in a

:10:08    21   press release that they issued that says there is no leakage

:10:11    22   of inflation throughout the entire procedure.

:10:12    23         We know that's not true.   Three to eight liters

:10:15    24   a minute of gas has to leak out of the abdomen the way their

:10:19    25   product is designed.

:10:20    1          Then SurgiQuest the showed publication by Dr.

:10:23    2    Ott to Dr. Burban, which indicates that one of the

:10:28    3    characteristics of the pneumoperitoneum is the chemical

:10:30    4    effects of the gas.  Well, you change the concentration of

:10:34    5    the gasses in the abdomen, you change the chemical effects

:10:38    6    of the gas.

:10:39    7          So the definitions where there is actual

:10:42    8    evidence as opposed to an expert saying just I think what

:10:46    9    this means, the definitions that are actually in print show

:10:50   10    that the pneumoperitoneum is not stable.

:10:52   11          They also advertise that they have an invisible

:10:55   12    air barrier.  What do their sales reps do with that

:11:00   13    definition?  The go out to explain to customers, they did

:11:04   14    this air bladder demonstration for Ms. Brenton.  They told

:11:08   15    her, see, no air goes into the abdomen.  She says, that's

:11:11   16    how it keeps the pneumo, that's what he said, because of the

:11:13   17    air barrier.  And she said she was quite convinced he was

:11:16   18    right.

         19          So SurgiQuest is out there saying the air

         20    barrier prevents air from getting into the abdomen and

         21    customers are confused.

         22          Craig Britten testified he did the same type of

         23    air bladder demonstration and he explained to the customer

         24    that the air barrier and the air seal prevents air from

         25    escaping from the abdomen and he explained that the air

1    barrier prevents air from getting into the abdomen.  He

2    explained both of those to the customer.

3               All false.

4               Carbon dioxide insufflator.  You heard lots of

5    witnesses talk about this.  And this is what you heard

6    universally.

7               Well, first of all, this is advertising.  It is

8    included in packets of materials that were handed out at

9    trade shows.  You heard that from Mr. Tegan yesterday and

10   you saw e-mails sent out by sales reps that attached this

11   document.

12              Just because the document originally came from

13   the FDA filing is irrelevant.  The fact that it's put in a

14   packet of promotional materials and handouts makes it

15   advertising.  And,

16              What you heard from witnesses about the truth of

17   that was Dr. Kobza said he would expect it to only deliver

18   carbon dioxide.

19              Mr. Fadem, 25 years selling products.  He sold

20   these things.  Not aware of an insufflator that delivers a

21   mix of carbon dioxide and air.

22              Dr. Redan:  Carbon dioxide insufflator delivers

23   only carbon dioxide.

24              Dr. Lee:  He agrees there is no other

25   insufflator, no other carbon dioxide that causes a mixture

1        of air and CO2 in the abdomen.  And,

2                Terry Redmond said that they understood it was

3        only delivering carbon dioxide to the abdomen.  That is what

4        he understood from the training.

5                Okay.  Is this material?  Of course this is

6        material.

7                You know, SurgiQuest's own document shows this.

8        Mr. Sterns's e-mail says when doctors find out about this,

9        they look at you like you just ran their mother over in a

10       car.  And,

11               Then you also heard SurgiQuest was maybe going

12       to be acquired by Stryker.  They went and did a trial of the

13       product, and they went back and they told SurgiQuest:  Well,

14       if the DPS is pulling ambient down into the vortex, we have

15       a serious problem.

16               They were seriously concerned about air

17       entrainment.

18               Dr. Kobza:  If you knew that 20 percent air,

19       30 percent air could get in there, would you buy it?

20               No, he wouldn't buy it.

21               Dr. Dulemba:  Suppose you learn AirSeal sucked

22       in air in the presence of leaks.  What impact would that

23       have on your decision?

24               I would never use it.

25               Ms. Brenton, where they did this demonstration,

this magician's trick for her:  Did the demonstration impact the hospital's decision to purchase AirSeal?

Partially it did.  These are important issues in deciding whether to purchase the product.

You heard surgeons say that, and Ms. Brenton is a robotic specialist at the PeaceHealth Hospital.

Even SurgiQuest's own sales rep indicates that the air seal capability is an important selling point.  So this is an important thing they emphasize when they try to sell the product, and that makes it a material falsity as well.

And we all know, seeing SurgiQuest's patent, it is also material because of the potential health impact.

SurgiQuest itself says it is undesirable for the safety of the patient.  And you have heard the evidence on that.

Risk of infection.  So we now have gas getting in there without being filtered as Mr. Sterns testified to.

And SurgiQuest has known since 2007 that when you change the CO2 concentration and put air in there, it appears CO2 doesn't support bacterial growth, but you put air in there you may have bacterial growth.

Dr. Redan explained, well, this is different than open surgery.  One of the reasons we have less infection with laparoscopic surgery is because of that CO2

1    environment in the abdomen.  You don't have that with open

2    surgery.  It has a higher rate of infection.

3              Risk of fire.  SurgiQuest's own engineers did a

4    study about the risk of fire.

5              And even Dr. Earle agreed that you could have a

6    fire start in the abdomen if you got enough room air in

7    there and you the right flammable gases in there.

8              How is that different than open surgery?  Well,

9    in open surgery, they can diffuse out into the room.  In

10   laparoscopic surgery, they are confined in a pressurized

11   abdomen.

12             And you heard a lot from Dr. Redan about

13   subcutaneous emphysema.

14             This is also something that doesn't happen

15   during open surgery.  This is a complication of laparoscopic

16   surgery because it is the fact that the gas is pressurized

17   and as it is trying to push out between the trocar and the

18   incision, some of it goes sideways into the tissue.

19             That is what Dr. Redan explained.  He explained

20   how the air and CO2 are under pressure and that is different

21   from an open procedure.

22             Dr. Redan showed you the results of this.

23   People, people end up with air going all over their body,

24   sometimes to their face, they have a swollen face, swollen

25   eyelids.  And,

1    SurgiQuest's CEO agrees that air entrainment can

2    exacerbate subcutaneous emphysema because air stays longer

3    in the body.

4    So SurgiQuest is well aware that sucking in air

5    is bad for the patient with respect to subcutaneous

6    emphysema.

7    Now, Dr. Redan, you will recall, we went over

8    this slide with him, and there is a series of exhibits here,

9    and we didn't show you all of these exhibits.  You can

10   request to see any of these as you deliberate.

11   But I'm going to point to, I'm going to show you

12   one of these.

13   The one I'm going to show you is from

14   Dr. Moawad.  So Dr. Moawad said I tried the AirSeal on, had

15   massive subcutaneous emphysema as I have never seen before.

16   Her entire body from the rib cage to her toes had

17   significant amounts of air that caused severe pain requiring

18   a 3-4 day hospital stay, which is extremely unusual for our

19   laparoscopic cases.

20   At the end of the paragraph, he says:  On the

21   other hand, the system provided no benefit in the case as

22   losing pneumoperitoneum is not a common problem in my cases

23   to justify the risk/cost.  And,

24   He says he initially planned on trying it on a

25   few more patients but after the patient suffered severe pain

1    and a prolonged hospital stay, he is no longer interested.

2              That is materiality.  That shows that this

3    matters to people who don't know the truth.

4              Now, Stryker also was concerned about

5    subcutaneous emphysema.  Mr. Stearns testified that what

6    Stryker was concerned about, and near the bottom here, for

7    the fact that if you had emphysema, you would have a longer

8    duration of it.  That is his understanding of what the

9    problem was.

10             Well, that brings us to SurgiQuest's false

11   advertising claim.

12             So SurgiQuest said there is something false

13   about this chart that Lexion distributed.  We're not quite

14   sure what it is.

15             Dr. Lee seemed to suggest that it had something

16   to do with a standard rates of thee complications that were

17   chosen, but then he also said he testified, well, that is

18   really a matter of judgment.  Because there was no

19   universally accepted rate.  So how can something here be

20   true or false?  It's simply a matter of judgment.  And,

21   moreover, there is really nothing wrong with the rates that

22   Dr. Ott chose.

23             With respect to the rate for pneumomediastinum.

24   It is disclosed in the Murdock paper that SurgiQuest used in

25   its response to this graph, and they used the exact same

1    number Dr. Ott used.

2              With respect to subcutaneous emphysema, the

3    number that both parties used is in the Murdock paper.

4    Dr. Ott chose one end of the range, Dr. Ott chose the other

5    end of the range.

6              With respect to pneumothorax, the rate is

7    disclosed in one of the very papers that reported

8    complications about the AirSeal.

9              And you saw Dr. Redan's explanation of that as

10   well as the testimony of Dr. Lee.

11             So there is nothing false about that graph.

12             Moreover, SurgiQuest claims it is being

13   irreparably harmed, but they didn't give you a single

14   witness who testified that this had any impact on their

15   purchasing decision.  They gave you a survey, but they

16   didn't have any real customer, they didn't show you any

17   documentation showing they lost any sales or that this

18   mattered to any of their customers and meanwhile their sales

19   continued to go up.

20             Now, let's talk about the instructions for use.

21             With respect to the instructions for use, I

22   would ask you to carefully consider Instruction No. 13 that

23   the Court gave you on things that are inconspicuously

24   located because the instructions for use are not included

25   with any of the advertising on air that we discussed

1    earlier.  They're somewhere else.  And as you saw when I

2    handed it to Mr. Fadem, they're pretty fine print.  They're

3    pretty hard to read.  Moreover, the testimony in the case

4    consistently has been nobody reads these.

5             Mr. Kobza, have you read any instructions for

6    use?

7             No.

8             Mr. Fadem, did SurgiQuest even give them to you?

9             I don't think they ever did.

10            Did you read them?

11            No.

12            Did you ever refer a customer to them?

13            No.

14            Mr. Redmond gave similar testimony.  Never

15   referred a customer to the instructions for use.

:20:48    16            Even Dr. Lee, Dr. Ramirez, the two experts for

:20:53    17   SurgiQuest, they weren't aware of air entrainment before

:20:56    18   this case began.  Nobody reads these things.  This is a

:21:00    19   sideshow.  It is an effort to deflect you from the false

:21:05    20   advertising and suggest, well, we told the truth somewhere,

:21:07    21   that if you went and hunted far enough, you could find it.

:21:11    22   That is not a defense to false advertising.

:21:16    23            Moreover, as Dr. Burban explained, the

:21:19    24   instructions for use themselves are false because the

:21:22    25   instructions for use say that the displacement of air is

:21:27    1    temporary and the entrained air will be displaced with CO2.

:21:32    2    Well, importantly, they say that occurs during these

:21:36    3    conditions as described above.  That's not true.

:21:39    4              Dr. Burban's tests show that as long as the leak

:21:42    5    is there, the air entrainment continues.  It's only when the

:21:46    6    leak goes away that the air returns to more normal levels.

:21:52    7              And then when somebody from Stryker pointed to

:21:55    8    these and said, hey, there is air entrainment, a doctor

:22:00    9    contacted them, what SurgiQuest's response?  They say it's

:22:04   10    sales theatrics.

:22:06   11              I think materiality, you can also consider in

:22:08   12    this case that SurgiQuest did not really want to know about

:22:12   13    this problem.  It's so material they really tried not to

:22:16   14    know.  So they were going to do a study, and the study was

:22:19   15    to determine an acceptable ratio of CO2 and air that did not

:22:25   16    compromise the safety and efficacy of the system.  But they

:22:28   17    didn't do the study.

:22:30   18              And, you know, nobody knows the maximum amount

:22:33   19    of air that gets into the system during an operation.  Mr.

:22:38   20    Babini, he doesn't know how much, what the maximum is.  Mr.

:22:42   21    Peters, he can't tell us what the maximum is.  Mr.

:22:46   22    Azarbarzin, he can't tell us the maximum.  He knows it's

:22:49   23    over 70 percent, but he can't tell us the maximum.  Dr.

:22:53   24    Ramirez, their expert, can't tell us the maximum.

:23:00   25              Gary Tegan couldn't tell us, either.

:23:04      1          FDA approval.

:23:05      2          We have heard a lot of discussion about FDA

:23:08      3    approval in this case.  The FDA does not approve SurgiQuest

:23:12      4    advertising.  You have heard no testimony to that effect.

:23:15      5          So we look at SurgiQuest's advertising for what

:23:19      6    it is.  SurgiQuest is trying to tell you, well, the FDA

:23:22      7    approved this so it must be safe.  Well, you have just seen

:23:24      8    a lot of evidence on subcutaneous emphysema showing that it

:23:28      9    is not safe and that real doctors actually have an issue

:23:33     10    with subcutaneous emphysema, and that a multi-billion-dollar

:23:37     11    company, Stryker, had an issue with subcutaneous emphysema

:23:42     12    when deciding whether to purchase SurgiQuest.

:23:44     13          But what the FDA does here in a 510(k), they

:23:47     14    rely on SurgiQuest for the information.  And here is what

:23:52     15    they didn't know.  They did not know that air entrainment is

:23:54     16    typically undesirable for the safety of the patient, because

:23:59     17    SurgiQuest did not tell them that.  They didn't supply their

:24:01     18    patent or any other information conveying that.

:24:06     19          The FDA did not know that the air levels could

:24:06     20    be up to 70 percent in the abdomen, per what Mr. Stearns's

:24:12     21    testing showed.

:24:12     22          The FDA also did not know that the shutdown

:24:15     23    safety feature had been removed.

:24:18     24          Now, SurgiQuest during this case has tried to

:24:21     25    minimize the important of leaks.  One example was the alarm.

| :24:26 | 1 | You may recall, Dr. Lee testified, the alarm is very |

annoying and very loud, and he says, there is no way I can

proceed on a case with that alarm going on.

I ask you to consider the credibility of Dr.

Lee's testimony.  For everything he said, based upon that

answer, you heard the alarm yesterday.  It was three little

beeps.  It doesn't repeat itself.  Of course, you can

proceed with the case with that alarm going on because it's

just three little beeps that's over in two seconds.

In addition, SurgiQuest's own documents show --

what they sell this thing for is you can maintain pneumo.

Where is that an issue?  That is an issue where you have

leaks.  It's the leaks that cause the pneumoperitoneum to

start to deflate.

So what they are selling people is, you don't

have to stop and worry about these leaks, you can keep

operating because this will maintain pneumo.  And that is

exactly what Worlds of Medicine, who helped develop the

product, said.  He said the surgeon will spend less time and

effort to look for and close leakages.  What that means for

materiality is that there is going to be more air in the

abdomen because the surgeon is not going to stop to fix the

leaks.

Okay.  Hysterectomies.  We have heard a lot of

testimony about hysterectomies in this case.  But it is very

:25:58     1    important.

:25:58     2              The video I played at the beginning, Dr. Redan

:26:00     3    explained, that was done during a laparoscopic hysterectomy.

:26:05     4    And you can hear just listening to the video how much air is

:26:08     5    getting sucked into the abdomen.

:26:12     6              SurgiQuest advertises, well, you don't need an

:26:15     7    occluder.  So they are encouraging the surgery to be done

:26:19     8    with the vaginal canal wide open, so the leak is greater.

:26:23     9    When the leak is greater, more air gets sucked in.

:26:27    10              Terry Redmond testified about this and he said

:26:31    11    that's what they were encouraged to do.  He testified he

:26:35    12    didn't see doctors do it, but did SurgiQuest tell him that

:26:37    13    air could enter the abdomen when that was happening?  No.

:26:38    14    That was not discussed.  That's what Mr. Redmond said.

:26:42    15              And how long does this last?  Well, Dr. Dulemba,

:26:47    16    who is a very well-respected gynecological surgeon, who gets

:26:52    17    patients from all over the United States, and

:26:55    18    internationally, says that that leak is going to be

:26:58    19    somewhere in the 20 to 25-minute range, and all the time

:27:02    20    that is happening, huge amounts of air are sucked into the

:27:06    21    abdomen.  Does the warning message come up during

:27:10    22    hysterectomies?  You bet.

:27:11    23              Listen to their sales reps.  Mr. Zacharias.  He

:27:14    24    has seen that message come up during a hysterectomy.  Mr.

:27:17    25    Britten, Mr. Ross, both talk about the colpotomy.  The

:27:20   1   colpotomy is when the uterus is removed during the

:27:24   2   hysterectomy.  They have seen that excessive leakage alarm

:27:28   3   come up.

:27:29   4           What happens?  Do you recall the surgeon doing

:27:30   5   anything in response to the warning?

:27:34   6           No.  Mr. Zacharias says they don't do anything.

:27:37   7   Why?  Because AirSeal -- SurgiQuest tells them, well, we

:27:42   8   have the AirSeal, that is going to keep your pneumo

:27:45   9   inflated.  You don't have to fix the leak.  So surgeons

:27:49   10  don't fix these leaks, and meanwhile, air continues to get

:27:52   11  sucked in as this procedure is done.

:27:54   12          More testimony from Mr. Zacharias.  What does he

:27:56   13  tell the doctor when there is this big leak during

:28:00   14  hysterectomy?  There is a leak and that AirSeal is managing

:28:02   15  it.  The AirSeal is managing it.  And at that point, it was

:28:05   16  during the hysterectomy and during the colpotomy, and they

:28:08   17  understood it.

:28:09   18          Oh, we are doing a hysterectomy.  We have a

:28:12   19  leak.  What he doesn't tell them, because he doesn't even

:28:15   20  know, is that they continue to suck in air.

:28:19   21          Okay.  Confusion.  Well, we have Ms. Brenton.

:28:19   22  This is the woman who had the demonstration done for her,

:28:29   23  where an artificial bladder was brought into the hospital to

:28:32   24  show her that no air gets into the abdomen.

:28:35   25          And the sales rep told her, well, it keeps

:28:39   1   pneumo because of the air barrier.  No air goes in, is what

:28:42   2   she was told.  What was her reaction?  She was convinced he

:28:46   3   was right.  So she is confused.

:28:49   4        Dr. Dulemba, did you have an understanding as to

:28:50   5   whether gas could escape?

:28:52   6        He assumed that it didn't escape.  He said, they

:28:56   7   described it as an air barrier.  Things can't penetrate in

:28:57   8   or out.  Dr. Dulemba was confused.

:28:59   9        Kristin Huth had a situation where she overheard

:29:03   10  a conversation between a SurgiQuest sales rep and a

:29:07   11  customer.  The customer said, can air get in?  The AirSeal

:29:11   12  rep's, response?  No.  Air doesn't get in.

:29:14   13        So SurgiQuest is out there telling people that

:29:19   14  air does not get in.  That's what they were trained.

:29:19   15        And you heard all of those sales reps testify,

:29:22   16  they were honest people, they would never try to deceive a

:29:25   17  customer.  The deception is not coming from the sales reps.

:29:29   18  The deception is coming from SurgiQuest's management.  The

:29:32   19  sales reps were not trained the truth.  They were told no

:29:36   20  air gets in or out, and that's what they trained customers.

:29:42   21  That's what the management trained them.  It's not the sales

:29:44   22  reps that are being dishonest here.

:29:46   23        Mr. Brenton did similar demonstrations.  And

:29:51   24  they told him, no, air does not get sucked into the port.

:29:51   25  Bottom of the screen, the customers accepted that it's not

:29:56    1    sucking in a bunch of air.

:29:57    2              Now, sales rep confusion.  The Court has some

:30:04    3    instructions about that as well.  Sales rep confusion is

:30:07    4    important because these are the people having the one-on-one

:30:10    5    conversations with the surgeons.  If the sales reps are

:30:14    6    confused, if they don't have the right information, then

:30:18    7    when the customer says, well, does air get in, they tell

:30:24    8    them, no, air doesn't get in, just like the last two sales

:30:24    9    reps you saw, so the fact that all these sales reps don't

:30:27   10    know the truth means that they are telling other people

:30:30   11    things that are incorrect as well.

:30:31   12              So Mr. Gilbo testified that he believed that the

:30:35   13    AirSeal seals the abdomen from outside air, and that was

:30:41   14    part of his training, that the AirSeal seals the abdomen

:30:44   15    from outside air.

:30:45   16              Mr. Ross, similarly, he doesn't believe it sucks

:30:48   17    in air.  Mr. Britton, he finds it unlikely that air could

:30:54   18    get sucked in.

:30:54   19              Other sales reps, they don't know if air can get

:30:59   20    sucked in.  SurgiQuest did not tell their sales reps the

:30:59   21    truth.

:31:05   22              Finally, published confusion.  There is evidence

:31:07   23    in the record that people were confused because this

:31:11   24    publication, they said, this surgeon said, well, there is no

:31:14   25    gas loss.  Again, we know that's not true.  So again we have

| | | |
|---|---|---|
| :31:17 | 1 | an instance of published confusion. |
| :31:19 | 2 | Okay.  Smoke.  SurgiQuest agrees that the filter |
| :31:25 | 3 | doesn't filter smoke.  You have heard plenty of evidence on |
| :31:28 | 4 | that and the smoke can escape. |
| :31:30 | 5 | So what do they advertise?  Smoke-free working |
| :31:34 | 6 | environment.  Smokeless laparoscopy.  I asked Mr. Babini: |
| :31:38 | 7 | Do you believe it would be accurate to say it's |
| :31:38 | 8 | smokeless laparoscopy? |
| :31:42 | 9 | He said, No, not with the correct iteration. |
| :31:43 | 10 | And then the rest of these advertisements, I |
| :31:46 | 11 | would ask you to look at Instruction No. 11, this is really |
| :31:51 | 12 | a collection of different statements, but they all convey |
| :31:54 | 13 | the same thing, that the staff is protected from the dangers |
| :32:00 | 14 | of surgical smoke. |
| :32:02 | 15 | The website says, Operate in a clear field |
| :32:06 | 16 | without fear of venting surgical smoke, and plume inter-op, |
| :32:06 | 17 | OR suite. |
| :32:09 | 18 | Protect your patient, your staff and yourself. |
| :32:12 | 19 | A smoke-free OR.  A smoke-free environment for your staff. |
| :32:17 | 20 | Staff not exposed to smoke plume. |
| :32:19 | 21 | We asked the sales rep, is that a true |
| :32:23 | 22 | statement?  That it provides a smoke-free environment for |
| :32:27 | 23 | your staff?  Mr. Davies said, no, it does not. |
| :32:30 | 24 | So, is this material?  Absolutely. |
| :32:33 | 25 | Dr. Dulemba was asked, are safety concerns |

:32:35  1    relevant?  Very relevant to him.

:32:35  2               Ms. Brenton:  Was it your belief that it

:32:39  3    filtered out carcinogenic gas?

:32:39  4               Yes.

:32:41  5               If smoke was released did you have a concern

:32:44  6    about it?

:32:44  7               Sure, we do.

:32:45  8               They are concerned about the health impact.

:32:52  9               Bryan Davies, four nurses were impressed with

:32:52  10   our benefits, specifically, the fact that it filters smoke

:32:55  11   and provides a smoke-free environment.

:32:57  12               These are things that matters to customers.

:33:00  13               Carlos Babini, he is aware that people that were

:33:06  14   selling this provided information to nurses on the health

:33:09  15   effects and used it as a selling point.

:33:15  16               The SurgiQuest's own internal training manuals,

:33:15  17   they acknowledge smoke as dangerous.  This is what they

:33:15  18   train their sales reps.

:33:20  19               So the health and safety issues with respect to

:33:21  20   smoke are another reason these are material.

:33:25  21               Confusion.  Again, Ms. Brenton, was it your

:33:29  22   belief that it filtered out carcinogenic gasses?

:33:32  23               Yes.  Ms. Brenton was confused.

        24               Dr. Dulemba:  He didn't think that smoke would

        25   vent out the AirSeal trocars.  He was confused.

|  |  |  |
|---|---|---|
|  | 1 | Ryan Hatfield.  He trained doctors that |
|  | 2 | carcinogenic gasses are filtered.  So those customers would |
|  | 3 | be confused. |
|  | 4 | Andre Gilbo:  Did you tell customers that it was |
| :33:42 | 5 | the best filter on the market?  Yes.  But we all know that |
| :34:00 | 6 | is not true. |
| :34:00 | 7 | Mr. Brenton:  Did it filter out gasses?  Yes. |
| :34:04 | 8 | The sales reps again were confused here.  They |
| :34:09 | 9 | didn't know it didn't filter out smoke.  They didn't know |
| :34:12 | 10 | smoke escaped from the trocar, and a number of them |
| :34:16 | 11 | testified of that. |
| :34:18 | 12 | Then, of course, we have the published article |
| :34:19 | 13 | from Catara, where the doctor wanted a smoke-free operating |
| :34:22 | 14 | room and he thought he was getting one with SurgiQuest. |
| :34:25 | 15 | Let's talk about damages. |
| :34:27 | 16 | So, yesterday, when I was cross-examining Dr. |
| :34:31 | 17 | Ugone, you saw some of this testimony up on the screen from |
| :34:35 | 18 | Ms. Amman. |
| :34:36 | 19 | The Intuitive Laboratory is key here.  Lexion |
| :34:39 | 20 | got into the Intuitive Laboratory, was starting to make a |
| :34:43 | 21 | lot of sales to robotic hospitals.  In fact, doctors were |
| :34:51 | 22 | calling Lexion asking to buy the product, when SurgiQuest |
| :34:52 | 23 | came along and started making its claims, basically, they |
| :34:57 | 24 | started taking away our sales.  This is important because, |
| :35:01 | 25 | you know, they argued at the beginning of the case we didn't |

:35:04     1    innovate.  What you heard during the case, that is actually

:35:05     2    not true.  The Synergy trocar was made to help maintain

:35:10     3    pneumoperitoneum in robotic cases.  It has the highest flow

:35:14     4    of any conventional trocar on the market.  None of those

:35:18     5    billion-dollar companies came out with a high flow trocar

:35:20     6    for robotic surgery.  Lexion did, and it got innovation of

:35:25     7    the year for that product.so if customers buy AirSeal

         8    because of some of the false advertising and the concerns

         9    that arise from that, the next best choice is the Synergy

       10    trocar.

       11        Now, Dr. Ugone gave some testimony about that he

       12    thought the $22.1 million damages calculation was too high.

       13    Let me show you something.

       14        In the year before the false advertising began,

       15    so 2010 to the end of 2011, the false advertising began in

       16    2012, Lexion's growth rate was about eight percent.  If you

       17    just say Lexion gets no advantage from being in the robotic

       18    laboratory and just continues to grow as it grew in that

       19    prior year, then Lexion lost $20 million worth of sales in

       20    that time period.  And,

       21        If we plot SurgiQuest's sales on this graph,

       22    SurgiQuest sales are skyrocketing, and that is because

       23    robotic surgery is increasing and people want the high flow

       24    capability of the trocar.

       25        So what SurgiQuest did is capture the very

1   market that Lexion designed the Synergy trocar for, and one

2   of the ways they did it is tell people that they heated and

3   humidified gas.

4           Now, corrective advertising.  Dr. Ugone says we

5   can just put something on the website or sent a letter.

6           That is not going to solve the problem.  You

7   heard ample evidence in this case, and I will show it to

8   you.

9           Mr. Spearman:  One-on-one meetings.

10          Ms. Moriarty:  We did conversations with

11  surgeons.

12          Ms. Amann:  One-on-one contact is huge.

13          Dr. Lee:  Personal one-on-one conversation.

14          That is how we got to corrective advertising.

15  And that takes hiring a bigger sales force to go out and

16  meet with people, and that is what Mr. Andrien's calculation

17  was based upon.

18          Now, willfulness.  This is an issue for you to

19  decide.  Okay?  You are the judges of whether SurgiQuest did

20  this willfully or not.  And I thank you for your attention

21  during this case that will allow you to exercise your

22  judgment on this issue.

23          I'm not going to tell you whether the

24  advertising was willful or not.  That is your decision.  But

25  let me suggest a few thing you should consider in making

1     your determination.

2          Again, we went over earlier what SurgiQuest

3     knew.  They have known about all these issues with their

4     product for a long time.

5          Mr. Fadem testified that they were trained to

6     target Lexion's customers.

7          They did these demonstrations with the

8     artificial bladder to show people that the air seal keeps

9     pneumo because of the air barrier and doesn't let air into

10    the abdomen.

11         And, Mr. Gilbo, who did the demonstration, we

12    asked him:  Did anyone at SurgiQuest teach you to do that

13    demonstration?

14         He said:  I believe in training we learned this.

15         They train their sales reps to deceive customers

16    by showing them that air doesn't go into the abdomen even

17    though they knew it did.

18         Mr. Britten:  Does the air get sucked into the

19    port?

20         He said:  No, it doesn't.  And they accepted

21    that.

22         Mr. Ross did these demonstrations with

23    artificial abdomens, and they would see, they would make

24    their own determinations.  But he did the same type of

25    demonstrations.

1            They also train sales reps no smoke escapes.

2            Did you gain the understanding that no smoke

3    escapes outside the air barrier?

4            Yeah, I got that through my training.  That is

5    what Mr. Gilbo said.

6            Mr. Fadem:  We were taught no air would escape.

7            Mr. Babini.  He helped train these people.  Did

8    they train the reps that the toxic and carcinogenic gases

9    did not escape?

10           He said yes, that is what they trained them to

11   do.

12           Okay.  So just kind of stepping back in this

13   case.  Yesterday, Mr. Tegan was asked:  If you understood

14   that a salesperson was making representations about a

15   product that were inconsistent with the way you wanted the

16   product to be marketed, what would you do?

17           He said:  I would tell them to stop.

18           Well, clearly the reps must have been doing what

19   he wanted them to do because we have seen plenty of evidence

20   that they were making lots of false statements.

21           But I would leave you with a couple of other

22   thoughts.

23           In 2012, Lexion did ask SurgiQuest to stop.

24   They wrote SurgiQuest a letter and said we think your false

25   advertising about heating and humidity.  We asked them to

```
 1    stop.  They said they would stop but then they continued

 2    doing it behind our back.  They didn't stop.

 3                Now, the only people that can make them stop are

 4    you.

 5                Thank you very much.

 6                THE COURT:  Thank you, Mr. Wille.

 7                Members of the jury, the lunches should be here.

 8    We'll come back at 1:30.  And we'll hear from Mr. Ryan.

 9                MR. RYAN:  Thank you.

10                (Lunch recess taken.)

11                *     *     *

12                1:30 p.m., Afternoon Session.

13                THE COURT:  Mr. Buckson.

14                (Jury returned.)

15                THE COURT:  Please take your seats.

16                Now we'll hear from Mr. Ryan.

17                MR. RYAN:  Your Honor, before I begin, I'd like

18    to thank you and your staff for all the help --

19                THE COURT:  Sure.

20                MR. RYAN:  -- and assistance you have given us

21    over the past week in this case.

22                Mr. Wille, I'd like to thank you and your team.

23    I don't agree with your conclusions but I know how hard you

24    have worked in this case so I respect that greatly.

25                I want to thank my team as well, our team as
```

1    well.   I think you have made our client proud.   Our firm

2    greatly appreciates the work you have done.   And,

3           Ladies and gentlemen, I want to thank you as

4    well.   I know it is difficult to sit through some of this

5    testimony, and we greatly appreciate the attention you have

6    given in this matter.

7           The opening statement that -- the closing

8    statement, pardon me, that Mr. Wille provided to you started

9    with a video.   And I think that video sums up where he

10   misunderstands the entire basis for this case.

11          That was a video of a woman who is having a

12   hysterectomy performed on her by a surgeon named Eileen

13   Casares who is a surgeon at Florida Celebration Hospital.

14   She is a surgeon who is a colleague of Dr. Reed who did

15   that videotape.   You heard testimony about that.

16          That surgeon uses the AirSeal system in the

17   hysterectomies that she performs.   In fact, she is probably

18   at Florida Celebration Hospital right now performing a

19   hysterectomy with the AirSeal device.

20          She is a GYN oncologist.   She uses the device to

21   save lives of women everyday.

22          And other hospitals, the top robotic hospitals

23   around the hospital, Sloan Kettering, MD Anderson, and

24   others, surgeons are using the AirSeal system.

25   Neurologists, gynecologists, other surgeons are using it

1    because they believe it's the safest product on the market

2    for them to do their surgical procedures.

3              Where Mr. Wille, we believe, and Lexion misses

4    the mark entirely, is he fails to acknowledge, recognize

5    this.  This is why surgeons purchase the product.  And what

6    it has tried to do, and what they have tried to do in this

7    case, which we take great issue with, is they tried to

8    convince you that there is some bogeyman out there.  There

9    is some danger out there with this product.

10             And all of their false advertising claims is

11   based on an untruth that they have told.  That the reason

12   why all these statements purportedly were made are material

13   because the device is unsafe.  Somehow air is dangerous.

14   The type of smoke in the abdomen is dangerous, and heat and

15   humidity was an absolute must have.  Despite what surgeons

16   do, day after day after day.

17             The case Lexion presents to you requires you to

18   conclude that the AirSeal device is dangerous.  It's unsafe.

19   Because if you don't conclude that, all of the statements

20   that Mr. Wille talked to you about, they're not material at

21   all.  It doesn't matter if there is heat and humidity.  It

22   doesn't matter if there is smoke that comes out of a trocar.

23   And it doesn't matter if air goes into the abdomen.

24             They have taken great lengths, they have taken

25   lots much time, to convince you otherwise.

1    When it comes to this issue of AirSeal safety,

2    there is Lexion and there is everybody else, everybody else

3    in the world:  robotic surgeons, our core competitors, other

4    insufflator companies, Intuitive, there is everybody else.

5    They want you to apply their standard of what

6    they think is important to the AirSeal product, and we

7    submit to you as strongly as we possibly can that that is

8    not only inappropriate, it is wrong.

9    They sent letters out to our customers claiming

10   the AirSeal product increases subcutaneous emphysema.  They

11   manipulate the data.  And Mr. Wille stands up in front of

12   you and says the FDA is irrelevant.  The very group whose

13   very existence is to make sure safe products are put on the

14   market has approved this not once but four or five different

15   times.  The product is audited, the product is evaluated.

16   And how does he prove this?  How does he suggest

17   this to you?  He puts on the stand Dr. Burban, who we will

18   talk about.  He is not an FDA expert.  He works for his

19   brother.  He is his brother's employee.

20   Their own chief medical officer testified in

21   this case.  They wrote to the FDA, and in the letters they

22   write not one, two e-mails and a letter, they write all

23   these bad things that the AirSeal system purportedly does.

24   It brings in air.  It creates other problems.

25   The FDA doesn't respond to a single e-mail, nor

 1    does it respond to a letter, nor does it take a single

 2    action, nothing with respect to this product.  Nothing.

 3            And the reason they did this, the reason they

 4    wrote to the FDA, they did it during the pendency of this

 5    litigation.  What they tried to do is to get the FDA to

 6    take action with respect to this product so that they could

 7    improve their position in this litigation.

 8            And we showed you these documents.

 9            Let's go back to where we started, when I first

10    met you, when I first talked to you about this case and this

11    product.  I talked to you about two companies,

12    Lexion/SurgiQuest.

13            Ladies and gentlemen, innovation is not clean.

14    It's not linear.  Sometimes it's messy.  Sometimes as a

15    product is being developed and you go from an old version,

16    which they talk about repeatedly to try to convince you that

17    the iFS system is dangerous.  They talk about the DPS.  They

18    prove it's getting made.  You learn things about a product.

19            And internally in a company, those issues get

20    discussed and worked out so that when the ultimate product

21    is put on the market, it's a good product.  It's a safe

22    product.

23            What they did, over and over in this case, is

24    pointed to a product, a DPS from 2009.  That is not the

25    product in this case, and they know it isn't.

|  |  |
|---|---|
| 1 | They try to convince you that a product that |
| 2 | sold 100 units was somehow the same as the iFS, a product in |
| 3 | demand by every top robotic surgeon in the country, to scare |
| 4 | you, to think there was some big problem with respect to air |
| 5 | getting into the abdomen. |
| 6 | Nothing could be further from the truth. |
| 7 | Necessity is what drove the creation of the AirSeal system. |
| 8 | Other insufflators, when they're used, the abdomen goes up |
| 9 | and down and during suction, it can collapse. |
| 10 | But we heard the testimony about how important |
| 11 | it is for robotic surgeons to have a product that makes sure |
| 12 | that the abdomen remains inflated.  That's the system. |
| 13 | That's why Dr. Lee at U Penn and other surgeons, |
| 14 | Dr. Patel at Florida Celebration, used this device.  That's |
| 15 | the innovation of it.  It doesn't matter if air comes into |
| 16 | it.  They don't care.  What they want to make sure happens |
| 17 | is that the abdomen remains inflated, especially for robotic |
| 18 | procedures, because you heard what happens.  If that robot |
| 19 | is on top of a human being and then that thing goes bad, |
| 20 | guess what happens to all those trocars?  They rip out of |
| 21 | the belly. |
| 22 | They rip out, because the robot arms don't go up |
| 23 | and down.  That is why this is so important to them. |
| 24 | It's not dangerous.  The surgeons aren't worried |
| 25 | about air from this product getting in. |

:35:29
:42:07
:42:10
:42:16
:42:25
:42:29
:42:32
:42:36
:42:40
:42:42
:42:47
:42:50
:42:51
:42:54
:42:57
:43:00

:43:08   1        We know they created different elements of the

:43:10   2   product, including this trocar.  This isn't just some

:43:13   3   product that was created to create profits for a company.

:43:18   4        This hole here, as explained to you by the

:43:21   5   surgeons themselves, is designed to allow the surgeon to put

:43:24   6   an instrument down there, down that hole, and cut tissue,

:43:29   7   during a hysterectomy, during another procedure, some type

:43:34   8   of cancer procedure.  It allows the surgeon to manipulate

:43:37   9   his or her equipment and then pull the entire piece of

:43:41   10  infected or cancerous tissue out of that hole without

:43:45   11  dropping any or losing any.  It's innovative.  And surgeons

:43:50   12  love it.  It's not unsafe.

:43:58   13       The are three key benefits, and you heard about

:44:00   14  them over and over and over again.  In my opening statement

:44:03   15  I showed you documents that ultimately Mr. Spearman even

:44:06   16  admitted to that demonstrated these benefits of the AirSeal

:44:09   17  system.  Namely, stable pneumo, continuous improved smoke

:44:14   18  removal, and valve-less access port.  We are going to talk

:44:17   19  about these, and what Mr. Wille is trying to convince you

:44:21   20  about with respect to these.

:44:27   21       This is a false advertising case.  You don't

:44:29   22  have to take my word for it.  You don't have to take his

:44:33   23  word for it.  You don't.  Look at what surgeons are doing,

:44:36   24  look at what robotic surgeons are doing.  They want you to

:44:39   25  believe that SurgiQuest has pulled the wool over the eyes of

:44:42   1    the entire robotic surgical population in the U.S.

:44:45   2              None of them know how the product functions.   No

:44:49   3    idea.   The only ones who know, they want you to believe, is

:44:54   4    them.

:44:59   5              What's happened in the marketplace?   You should

:45:03   6    be proud of this.   600,000 successful uses to date.   And it

:45:07   7    is growing.   Why is it so important?   You heard this

:45:10   8    yesterday when Ms. Amman was on the stand.   This device

:45:13   9    allows surgeons to operate more quickly, which means they

:45:16   10   can do more surgeries, which means they can help more people

:45:19   11   and they can reduce costs for the hospitals, which allows

:45:22   12   the hospital to do more things.

:45:24   13             That's what this product does.

:45:26   14             He talks as if it is some death machine, unsafe

:45:29   15   product.   It's not.   See, you have heard surgeon after

:45:36   16   surgeon say, there is some air, it dissipates.   What's the

:45:39   17   problem?

:45:43   18             Now, Lexion, they had an idea.   It came up with

:45:48   19   some heating and humidity tubing.   And when it first

:45:53   20   launched the product, its sales did well.   It did.   It was

:45:57   21   new.   It was novel.   They were engaged, probably, at the

:46:02   22   time, maybe Mr. Spearman was paying attention at the time.

:46:05   23   Maybe he knew who the top customers were for him to focus on

:46:09   24   at that time.

:46:10   25             But what happened to it is it dropped, its

:46:13   1   growth rate continued to slow and slow and slow and slow.

:46:17   2   And it wasn't until this point, this point here, where the

:46:21   3   SurgiQuest product ever entered the marketplace.  I told you

:46:25   4   that, I showed you that when I opened with you.

:46:30   5          This has nothing to do, their drop in sales,

:46:33   6   nothing to do with SurgiQuest.  They couldn't even release a

:46:39   7   successful product.  The SurgiQuest product, they keep

:46:41   8   talking about how great it is.  It didn't even work with the

:46:45   9   Intuitive robot.  There is evidence, and I showed you this

:46:48   10  in the opening and you heard some of the testimony, it

:46:51   11  didn't link up with the robot.

:46:53   12         So they didn't want it.  Their own salespeople

:46:57   13  got sick of trying to sell it so they stopped trying to sell

:47:01   14  it.  That has nothing to do with SurgiQuest.

:47:04   15         What did their own witnesses say about the

:47:06   16  market importance, the penetration rate of this incredibly

:47:09   17  valuable device, they claim?  Dr. Ott, one to two percent of

:47:14   18  the surgeons wanted heat and humidity.  I think Ms. Amann

:47:18   19  said four to five percent market share.  Less than one

:47:22   20  percent of the trocar market was Patrick Spearman.  And I

:47:25   21  think 94 percent of the market didn't care about heat and

:47:27   22  humidity.  That is their expert, Dr. Redan.

:47:30   23         This is the great technology we are hearing

:47:32   24  about?  This is the great technology that the SurgiQuest

:47:36   25  product took sales from?

```
:47:38    1              Ladies and gentlemen, common sense prevails
:47:39    2    here.  The marketplace tells us, tells you, what happened
:47:43    3    here.
:47:46    4              Let's talk about who you heard from today -- I
:47:52    5    am sorry, during the trial.
:47:53    6              Well, these two worked together for many, many,
:47:57    7    many years.  Spearman's brothers are part of the company,
:48:05    8    they have ownership interest in it.
:48:08    9              Worked with Dr. Ott forever.  You didn't hear
:48:10   10    from Mr. Geisz.  He has been here the whole week.  He is
:48:14   11    also involved with the company.
:48:17   12              And their big expert, Dr. Burban, is their
:48:22   13    employee.  Could you imagine if he had come here and said,
:48:27   14    you know what?  Insuflow is not so good, no one really wants
:48:31   15    it.  Do you think he would have a job when he left?
:48:35   16              It all goes back to him.  It all goes back to
:48:41   17    his story about how SurgiQuest's AirSeal system is unsafe.
:48:47   18              Then Dr. Ott's buddy Dr. Redan, 20-year
:48:53   19    friendship.
:48:56   20              When I opened I told you what was going on in
:48:58   21    the marketplace.  We showed you documents and you heard
:49:00   22    about it.  The robotics trend, which the evidence has shown
:49:06   23    that Lexion missed, they missed it.  They didn't have a
:49:09   24    product on the market when robotics were increasing that
:49:13   25    could do what robotic surgeons wanted.  By the way, they
```

| | |
|---|---|
| :49:16 | 1 |
| :49:19 | 2 |
| :49:22 | 3 |
| :49:24 | 4 |
| :49:27 | 5 |
| :49:31 | 6 |
| :49:33 | 7 |
| :49:36 | 8 |
| :49:41 | 9 |
| :49:43 | 10 |
| :49:45 | 11 |
| :49:47 | 12 |
| :49:51 | 13 |
| :49:54 | 14 |
| :49:57 | 15 |
| :50:02 | 16 |
| :50:07 | 17 |
| :50:10 | 18 |
| :50:13 | 19 |
| :50:16 | 20 |
| :50:21 | 21 |
| :50:23 | 22 |
| :50:27 | 23 |
| :50:30 | 24 |
| :50:33 | 25 |

still don't to this day.  They have no insufflator on the market.  They have a trocar, that's it.  No insufflator that pushes gas into the system.

They talk about flow rate.  They need to be hooked to an insufflator.  They don't have a product that competes.  Barriers to entry, we heard this over and over again.  They were losing sales because they couldn't get contracts.  We saw salespeople over and over again say that.

Too much industry competition, they had a questionable technology.  And they didn't manage their business very well, either.

Mr. Spearman couldn't even tell you who his top customers were.  He talked to you about Wal-Mart.  They don't sell to Wal-Mart.

So what did they do?  As the company is going down, let's find a target.  Who are we going to blame?  Well, let's go to SurgiQuest.

So they send out, they start by sending out misleading complication charts.  This is where it starts really with them, and it continues.

The issue in this case is not about the safety of the AirSeal system.  That's what they want you to believe.  That's what they want you to believe.  And it's not .

It's about whether or not consumers were

:50:35   1   deceived to purchase the SurgiQuest AirSeal device.  I will

:50:40   2   submit to you, there was no consumer deceived as to whether

:50:44   3   it wanted to purchase a tube that heats and humidifies and a

:50:47   4   $31,000 piece of equipment that allows an abdomen to be

:50:51   5   inflated at all times so the surgeon doesn't have to worry

:50:54   6   about having it collapse.  There is no way that that is

:51:00   7   accurate.

:51:03   8           Now, Mr. Wille didn't talk to you much about the

:51:06   9   elements of these claims, what he had to prove.  He wanted

:51:09   10   to get through it as fast as he could.  He told you, I am

:51:12   11   going to do this quickly.

:51:13   12           Actually, that is what this case is about.  If

:51:15   13   you do it quickly, he can blow past people.  But if you stop

:51:20   14   and think about it, he has to prove, he has to examine, he

:51:24   15   has to show, and you realize the case is utterly baseless.

16   Now, he hasn't shown one, one false or

17   misleading statement.  Not one.  Every single advertising

18   statement was true.  And,

19           More importantly, what did he say was even

20   commercial advertising?  I don't know which claims he was

21   even talking about.  Which were commercial advertising?

22           And the FDA document he says is commercial

23   advertising?  A document no consumer ever sees, that is

24   commercial advertising?  He just puts it all on the stew and

25   puts it on to you and says figure it out.

1        Again, give me money, give me damages.  I can't

2  tell you what advertising is or not, what caused harm or

3  what didn't.  We're entitled to loss of money.  And,

4        He didn't use the word, I don't believe,

5  causation.  That something that SurgiQuest did, that a

6  specific statement was something that caused a surgeon to

7  make a decision, which caused them to lose a customer.  That

8  is what they're supposed to prove.

9        Well, we have lots of evidence to show that the

10  sales reps never said that the AirSeal system heated and

11  humidified.  You have seen all of it.  And then he points to

12  six, this is Dr. Burban points to six e-mails sent by sales

13  reps, as if that represents what the company was doing, that

14  represents what the company's plan was.  Six e-mails?  Six

15  e-mails.  Six individuals sending e-mails.  That is a

16  corporate policy, according to Mr. Wille.

17        70,000 surgeons in the United States, and they

18  claim that 125 e-mails saying that tissues remain moist --

19  which, by the way, the tests done, including the test by

20  Dr. Collins in MIT, graduate engineer, concludes that yes,

21  in fact the tissues remain moist.  They want to tell you

22  that that is false.  And,

23        By the way, it's important because it's material

24  because it is so dangerous, this product.  If it didn't do

25  this, it's dangerous.  That is why, that is why SurgiQuest

1  was trying to hide it.  There are thresholds they must meet.

2          Customers are not deceived by this because many

3  of the issues that Mr. Wille has raised to you, they don't

4  care about.

5          Who are the customers?  They're surgeons,

6  they're hospitals, highly sophisticated operations, who know

7  what they're doing.  Do you think hospitals would purchase a

8  product and use it 600,000 times and believe it's unsafe?

9          I mean there are institutes, robotic institutes

10  around the country where the surgeons there demand this

11  product.  They don't demand it because it purportedly heats

12  and humidifies.  They could care less about that.  They

13  demand it because those surgeons, in their time of most

14  need, when there is a bleed, their suction needs to be

15  applied, the device will not allow the abdomen to collapse.

16  And for them to suggest that surgeons were buying the

17  product because of what their product did is utterly

18  ridiculous.

19          How are sales achieved?  It isn't some contact

20  with the surgeon and okay, let's go.  We have a deal.  That

21  is not what happens.  It is a much more complicated process.

22          There is a product introduction.  There are

23  review of clinical studies.  There are product trials.

24  There are considerations by doctors, hospitals, committees.

25  And in those committees, they review the IFU, which is what

1    the testimony was, so they understand how the product

2    functions so they can test it.

3              The IFU, by the way, which is required by

4    federal law.  The FDA is not irrelevant as suggested by Mr.

5    Wille.

6              Then there is a purchase, and there is use.

7              It takes six months to do that.  This isn't some

8    confusion created or deception created by a salesperson.

9    These people who purchase this product are far more

10   sophisticated than that.

11             Well, here is the laundry list of claims.

12   Laundry list.  They don't tell you which one of these, if

13   any, caused a single penny of harm.  Not once.  They didn't

14   tell you.  Which one?  Which one of these did?  Which one of

15   these are even considered to be advertising?

16             These aren't, that's for sure.

17             So what do we have?  How did the customer

18   interpret the statements to mean?  What did the surgeons

19   think?  Would it have been easier to find out?

20             Just do a survey and ask robotic surgeons how

21   they perceive these statements.  They don't want to do that.

22   They wanted to haul in a bunch of sales reps, a bunch of

23   sales reps as if the sales reps know how the surgeons that

24   provide lifesaving surgery perceive these statements.

25   That's their brief.

1       It would have been so easy to have done a survey
2  but they didn't do it and you should ask why.
3          There has been no literal falsity here.  The
4  testing that was done establishes it.  AirSeal is not
5  literally false.  We'll go through these.
6          And what is important is if it is misleading,
7  it's got to be misleading to a substantial portion of the
8  intended consumers.
9          Where is the survey that shows a substantial
10  portion?  Where is any evidence that shows a substantial
11  portion of the intended consumer was deceived?  There isn't
12  any.
13          AirSeal and the invisible air barrier.  They
14  want you to believe that these were false, literally false,
15  and they want you to believe it based on this idea that
16  somehow air getting into the abdomen is unsafe, which we
17  know is not true.  We heard from Dr. Lee and others.
18          We asked them what do you think of these?  Well,
19  there is no rubber seal.
20          Even Mr. Spearman said during testimony, it
21  would be reasonable to conclude an interpretation it's not a
22  seal.
23          It's air.  It's air that creates a barrier.
24  It's an air seal.
25          This is Dr. Collins.  Again, MIT engineer:  It

1 creates that pressure barrier that maintains that stable

2 pneumoperitoneum.  Barriers don't have to block everything.

3          And that is what Dr. Burban actually said.  He

4 said a couple things inconsistently.

5          Is it reasonable to assume that AirSeal meant

6 they a seal of air, an air barrier?  That is all it was.

7 Would anybody think when you put a surgical device down the

8 middle of the trocar that air could not get in and out?

9 That is what they want you to believe.  Surgeons were using

10 it to put instruments down there.  It was simply a barrier,

11 right here (indicating), made of air.  That is all it was.

12 That is all it is.  And,

13          How did consumers interpret these statements?

14          Maintain stable pneumo, carbon dioxide

15 insufflator.  These other comments.

16          Well, the FDA called it a carbon dioxide

17 insufflator.  And if you look at it, by the way, it's got

18 CO2 tanks attached to it.  And if you listen to

19 Dr. Collins's testimony, CO2 flows into it at all times,

20 never stops.  And,

21          Remember why they want you to think this is

22 literally false.  Because they want you to believe that air

23 getting into the abdomen is a big deal.

24          It's not.  That is the basis for the literal

25 falsity claim.  Because you had to be hiding it, because air

1    is so bad.

2              Dr. Redan talked to all of the surgeons at

3    Florida Celebration Hospital and told them that air got in.

4    Do you know what they did?  So what.  They continued to use

5    it.

6              The video we showed, Dr. Casares uses it all the

7    time.

8              Dr. Patel, one of the finest robotic surgeons,

9    uses it, only uses it for his surgery, his surgical

10   procedures.

11             Dr. Ramirez told you he will only use it unless

12   there is a waiting list and then he has got to use something

13   else.  And,

14             That is what Dr. Lee told you, too.

15             And they all said carbon dioxide insufflator,

16   because CO2 is used.

17             Then they try to tell you it's not stable

18   pneumoperitoneum because air gets in instead of CO2.  Yet

19   again, what do the experts say?

20             Okay.  I have written books about this.  Stable

21   pneumo means the abdomen remains stable.  It doesn't matter

22   if it's air coming in at times to protect the safety of the

23   patient.

24             Dr. Ott, in his own publication, said:

25   characteristics of pneumoperitoneum are related to

1    mechanical pressure effects regardless of the chemical

2    formula of the gas used.  That is their own chief medical

3    officer.  They come in here now and tell you that it can't

4    be stable pneumo when air gets in.  And their own chief

5    medical officer -- who, by the way, you never saw -- said

6    this.  (Indicating).

7            Well, we know that there are dictionaries that

8    also defined it.  It doesn't matter whether it is gas, air

9    or something else, stable pneumoperitoneum.

10           And then we have the documents submitted to the

11   Food and Drug Administration on numerous occasions where

12   they're told that air gets in.  And it gets approved by the

13   irrelevant FDA.  Literally false?

14           Now, there is smoke.  Now, the statements about

15   smoke relate to removing smoke from the abdomen.  That was

16   the important feature that surgeons -- and you heard Dr. Lee

17   and others testify -- they wanted smoke removed from the

18   abdomen so they can see.

19           And what these guys come in here and tell you

20   that there is cancerous smoke.  They go around the country

21   deposing people, using the words "cancerous smoke is

22   released" so they can come in here and tell you how

23   dangerous this product is.

24           You heard the testimony here.  The doctors said,

25   five percent of doctors just had that smoke released into

1     the operating room.  Not filtered.

2          Those surgeons that spend their lives saving

3     other people are, what, putting people at risk?  It's too

4     high of a risk?  This is a creation.  This is what they are

5     trying to create for you.

6          This is the basis upon which the entire case is

7     built.

8          Humidity.  Here is a test.  One of our engineers

9     tested it.  And it showed that our device actually, because

10    of the recirculation, keeps the abdomen warm.  And you heard

11    Dr. Ramirez testify that if you worried about whether the

12    patient is cold or not, you know what you can do?  Put a

13    blanket on them.  A bear-huggie.  That's the complicated

14    technology, the wildly valuable technology they want you to

15    believe they have.

16         It's the same thing as a blanket.

17         He tested it.  You heard Dr. Collins, again, MIT

18    engineer, tell you, that's fine.  It is as advertised.  It

19    maintains heat and humidity.

20         Did any of these consumers, a substantial

21    portion of them, were they deceived?  No way.  No chance.

22    Did they even bother asking any surgeons?  Nope.

23         How did customers interpret these?  Well, they

24    make a big deal out of this sample cost comparison.  Mr.

25    Tegan testified, this document was used for a period of

:03:33    1    time, a year or two, they stopped using it because hospitals

:03:36    2    had their own cost comparison document.  And what did their

:03:41    3    own witness say about whether or not this document was

:03:44    4    misleading.  Kassi Hidenreich, you saw her deposition

:03:48    5    yesterday, when you saw the cost analysis where they said

:03:52    6    humidifier not needed, do you understand that to mean that

:03:54    7    the AirSeal system heats and humidifies the CO2?

:03:59    8          "No."

:04:00    9          Matthew Montano, Lexion's sales rep:  Did any

:04:03    10    customer tell you that SurgiQuest had told them that the

:04:06    11    AirSeal actively heats and humidifies the insufflation gas?

:04:09    12          "No."

:04:11    13          Then Dr. Dulemba:  And was it obvious to you

:04:15    14    when you trialed the device that the AirSeal system does not

:04:17    15    actively heat and humidify the CO2?

:04:21    16          "Yeah, yeah."

:04:27    17          Smoke.  They don't even seek a penny of lost

:04:31    18    profits from SurgiQuest as a result of allegations of false

:04:36    19    advertising regarding smoke.  Not one penny.  What smoke was

:04:40    20    designed to do, ladies and gentlemen, it was designed to

:04:43    21    scare you, to make you think that the AirSeal system was

:04:48    22    releasing hazardous smoke into the operating room.

:04:53    23          The advertisements about smoke-free working

:04:56    24    environment were about the abdomen.  That was the key issue,

:05:00    25    removing smoke from the abdomen.  Were there a couple of

:05:04  1  sales reps that went too far?  Yeah, there were.  That

:05:08  2  happens with salespeople sometimes.  And you deal with them.

:05:11  3  You make sure the statements are proper.

:05:15  4        The core issue here was with smoke-free

:05:18  5  environment in the abdomen.  And they know that.  But they

:05:21  6  try to tell you it's something different, and they made up

:05:24  7  this big story about the hazards of smoke.

:05:33  8        There is no evidence at all of any literal

:05:35  9  falsity or anything misleading about these statements, none.

:05:40  10        That should end the case right here.  But we

:05:43  11  should go on, because what we should talk about too is

:05:46  12  materiality.  Materiality, what he wants you to believe and

:05:50  13  what he told you is materiality is all about the safety.

:05:53  14  These are real important issues about safety.  That is not

:05:56  15  what materiality is in a false advertising case.

:05:59  16  Materiality is whether or not the statement would drive a

:06:02  17  surgeon to purchase the product.  We know from hearing the

:06:05  18  surgeons, time and time again, they didn't care about air

:06:09  19  entrainment.  They didn't care about heat and humidity.  And

:06:12  20  smoke removal was a nonissue to them.

:06:14  21        That it what materiality is.  Not a single

:06:18  22  statement upon which they bring their false advertising

:06:21  23  claim was material, because no surgeons bought it because of

:06:24  24  those statements.

:06:27  25        The testimony you have seen already about what

:06:32   1   the doctors were saying regarding heat and humidity, was it

:06:37   2   needed, they wouldn't recommend it, they didn't care about

:06:40   3   it, if it was such a great technology, if it were so

:06:44   4   important, if surgeons wanted it so badly, why 4 percent of

:06:47   5   the marketplace, before SurgiQuest ever brings its product

        6   onto the market?

        7            We know why.  Because surgeons didn't care about

        8   it.  Maybe a small number thought it might be helpful.  And

        9   they basically tried to bring every one of those people that

       10   exists to tell you that it's important.  The vast, vast

       11   majority of surgeons do not care.

       12            We know even from the testifying experts, stable

       13   pneumo, it is critical, valveless access, these are the

       14   things that are driving sales, these are the things that are

       15   driving demand.

       16            Surgeons care about visibility, not filtration.

       17   Mark Zacharias, In your experience selling the AirSeal

       18   system, is the filtration of smoke an important

       19   consideration in purchasing the product?

       20            "Answer:  In my experience I don't think it is.

       21            "Question:  Why not?

       22            "Answer:  Doctors are more concerned with pneumo

       23   and improved visibility and laparotomy, lower pressure."

       24            This guy you saw, they brought him in, played

       25   his videotape, he actually had a doctor tell him that the

1  invisible smoke to the abdomen, that he could care less.

2          And they didn't finish the Tiffany Benton piece,

3  where she says that:  Not necessarily for the filtering

4  system because they felt, that's important to them, but more

5  important is the visualization portion of it.

6          They left that part out, Mr. Wille did.

7          Air entrainment, is it material?  Dr. Redan went

8  back to his hospital, Florida Celebration, one of the top

9  robotic hospitals in the United States, what did they do?

10  What did the robotic surgeons say?  They keep using it and

11  using and using it.  That tells you whether a statement is

12  material or not.  Not some effort to make you believe there

13  is some harm.

14          Memorial Sloan-Kettering uses it.  All these

15  hospitals use it.  They know full well about air getting in.

16          Dr. Redan talks about his own colleague, Dr.

17  Patel, who runs the Robotics Institute.  Dr. Patel knows

18  about it.  He uses it.

19          Air entrainment.  Dr. Lee, Dr. Ramirez, they

20  don't care.

21          Their sales rep, Montano, they are training him,

22  hey, use the fact that air gets into the abdomen to sell

23  against the AirSeal system.  So he does.  He uses that

24  because he believes that the surgeons are going to make a

25  change.  What does he say?  Surprisingly, the $CO_2$/air

1    conversion had not had as much of an impact as I would have

2    imagined.

3              In other words, he didn't care.

4              None of these statements are material.

5              Injury, there is no causal link, no causal

6    connection, he hasn't shown anything that connects any of

7    these statements to any harm suffered by Lexion.

8              Let me give you an example.  Imagine it's M.D.

9    Anderson, and there are six surgical systems, and the rest

10   of the operating rooms have a different insufflator.  Lexion

11   is free to sell to all of those.  They are not harmed

12   because SurgiQuest has sold an AirSeal system into the

13   hospital.  If humidification is so important, they can sell

14   to all these other operating rooms, and they don't, and they

15   can't, because customers don't want the product.

16             They also ignore the market share that actually

17   exists out there.  This is a wildly competitive marketplace,

18   where people are fighting each other in a good way for what

19   their products can provide and what their products can do.

20   They are not going to be able to compete with these

21   companies.  And they are never going to be able to compete

22   against these companies.  Some of the most powerful medical

23   device companies in the world.  They have got no market

24   share.  None.  They face stiff competition, there is other

25   insufflator companies, other than ours, who may not want

1  their products, may not need their products, may not think

2  that much about their products.

3          Heat and humidity.  They want to tell you that's

4  what causes the surgeon to make a decision, it's going to

5  take an $80 product that's going to do the same thing, they

6  claim, Mr. Wille says the same thing, this product that

7  saves lives by making sure the abdomen remains inflated the

8  entire time?

9          The overwhelming evidence tells us that Lexion

10  lost sales, its business decreased some, for reasons that

11  had nothing to do with SurgiQuest.  We know that based on

12  when they released their product when sales slowed and

13  slowed and slowed and slowed.

14          We know that because they have a lot of

15  contracts, we know that because they are competing with

16  companies for products that they know other people want.

17          This is Mr. Andrien's -- it would be a

18  miraculous event where from one year to the next, this

19  product that has been dying slowly for a time, would have an

20  immediate jump, massive increase in sales.  You heard Mr.

21  Andrien's testimony.  We heard Dr. Ugone's testimony about

22  what Mr. Andrien did.  There is no basis for this conclusion

23  whatsoever.  There has been no showing of injury in this

24  case.

25          And what's most troubling, too, about what they

1   have tried to tell you, they tell you that with robotic

2   surgeons, if the SurgiQuest product was not on the market,

3   95 percent of every sale SurgiQuest made to a robotic

4   surgeon would go to them.  There is absolutely no basis for

5   that.  And that is the only damages opinion that they have

6   offered in this case.  95 percent of SurgiQuest's products

7   would end up going over, robotic surgeons, customers, would

8   go over there.

9            Again, they offered no opinion on anything to do

10  with smoke.  Yet they talk about smoke and smoke and smoke

11  in this case.

12           Corrective advertising, there is no explanation

13  provided to you about how a single one of those statements

14  requires any type of corrective advertising.  How much

15  corrective advertising would be required for just heat and

16  humidity?  Did they provide you any analysis as to that?

17  No.

18           What if it were just smoke removal?  Was there

19  any analysis as to how one of those statements caused harm

20  or would require corrective advertising?  No.  Again, put it

21  in a big stew, and just gave it to you, you figure it out.

22  At no time did they take any steps to connect a single lost

23  sale to anything that SurgiQuest did.

24           Disgorgement of profits, they put Mr. Andrien up

25  there and tell you that SurgiQuest has driven 120 million

1    dollars in revenue, but they don't tell you all the

2    expenses, the fact that the product has costs and that no

3    profits have been made.

4                   Here is what the facts have shown.  They

5    haven't shown a single penny of harm caused by SurgiQuest.

6    They haven't shown a single penny as to why corrective

7    advertising would be needed for any purpose.  This, you

8    heard from Dr. Ugone the company hasn't even made any money

9    yet.  It hopes to, we believe it will, but it hasn't to

10   date.

11                  This is what we ask that Lexion get in the form

12   of damages:  nothing, because they haven't proved that they

13   have suffered any.

14                  Ladies and gentlemen, when you get this verdict

15   form, we are going to ask you to fill it out and answer

16   Questions 1 through 7 no, because at no time did Lexion ever

17   prove that SurgiQuest caused it a single penny of damages,

18   and during the 45 minutes or so that I have been speaking to

19   you, more surgeons, top robotic surgeons, have started

20   surgical procedures using the AirSeal system to save more

21   people.

22                  Thank you very much for your time.

23                  THE COURT:  Thank you, Mr. Ryan.

24                  Mr. Buckson, will you swear our jury officer,

25   please.

```
 1                    (At this point the jury officer was sworn.)

 2                    THE COURT:  Ladies and gentlemen, you are free

 3      to commence your deliberations.

 4                    (At 2:15 the jury retired to deliberate.)

 5                    (Court recessed.)

 6                    (Court resumed.)

 7                    THE COURT:  All right.  Please bring in our

 8      jury.  We have a verdict.

 9                    (Jury enters courtroom at 4:30 p.m.)

10                    THE COURT:  Take your seats, ladies and

11      gentlemen.

12                    Ladies and gentlemen, who speaks for you?

13                    JUROR NO. 1:  I do.

14                    THE COURT:  Juror No. 1, would you please rise.

15                    Have you and your colleagues reached a unanimous

16      verdict?

17                    JUROR NO. 1:  We have.

18                    THE COURT:  Would you please hand it over to Mr.

19      Buckson?

20                    (Juror No. 1 complies.)

21                    THE COURT:  And retake your seat.

22                    Ladies and gentlemen, we are going to review the

23      verdict form, and then I am going to ask you to listen

24      carefully as Mr. Buckson announces your verdict, as you may

25      be polled individually as to whether this is your individual
```

1   verdict.  Okay.

2           (Pause.)

3           CHIEF DEPUTY CLERK BUCKSON:  Do you find that

4   Lexion has proven, by a preponderance of the evidence, that

5   SurgiQuest is liable for false advertising based on

6   statements concerning heat and humidification?

7           Answer:  Yes.

8           Question:  Do you find that Lexion has proven,

9   by a preponderance of the evidence, that SurgiQuest is

10   liable for false advertising based on statements concerning

11   air?

12           Answer:  Yes.

13           Question:  Do you find that Lexion has proven,

14   by a preponderance of the evidence, that SurgiQuest is

15   liable for false advertising based on statements concerning

16   smoke?

17           Answer:  Yes.

18           Do you find that Lexion has proven, by a

19   preponderance of the evidence, that SurgiQuest engaged in a

20   deceptive trade practice against Lexion?

21           Answer:  No.

22           Question:  Do you find that Lexion has proven,

23   by a preponderance of the evidence, that SurgiQuest

24   intentionally or willfully made a false advertising

25   statement?

1       Answer:  Yes.

2       Question:  Do you find that Lexion has proven,

3   by a preponderance of the evidence, that SurgiQuest engaged

4   in unfair competition against Lexion?

5       Answer:  Yes.

6       If you answered yes to Question 6, then do you

7   find that Lexion has proven, by a preponderance of the

8   evidence, that SurgiQuest intentionally or recklessly

9   engaged in unfair competition?

10      Answer:  Yes.

11      Question:  If you answered yes to any of

12  Questions 1 through 3 or 6, what do you find is the amount

13  of Lexion's lost profit damages with respect to its claims?

14      Answer:  2.2 million.

15      If you answered yes to any of Questions 1

16  through 3 or 6, what do you find is the amount of Lexion's

17  amount of corrective advertising damages with respect to its

18  claims?

19      Answer:  Zero.

20      If you answered yes to Question 7 and awarded

21  compensatory damages to Questions 8 and/or 9, then please

22  enter the amount of punitive damages if any you have chosen

23  to award.

24      Amount.  Ten million.

25      Do you find that SurgiQuest has proven, by a

1  preponderance of the evidence, that Lexion is liable for

2  false advertising based on the complications chart?

3           Answer:  No.

4           Do you find that SurgiQuest has proven, by a

5  preponderance of the evidence, that Lexion engaged in a

6  deceptive trade practice against SurgiQuest?

7           Answer:  No.

8           "Question:  Do you find that SurgiQuest has

9  proven, by a preponderance of the evidence, that Lexion

10 engaged in unfair competition against SurgiQuest?

11          Answer:  No.

12          THE COURT:  Does either party wish to have the

13 jury polled?

14          MR. RYAN:  Yes, Your Honor.

15          THE COURT:  Mr. Buckson, please.

16          CHIEF DEPUTY CLERK BUCKSON:  Juror No. 1, having

17 delivered the verdict, is that your verdict also?

18          JUROR NO. 1:  Yes.

19          CHIEF DEPUTY CLERK BUCKSON:  Juror No. 2, having

20 heard the verdict delivered by the foreperson, is that your

21 verdict also?

22          JUROR NO. 2:  Yes.

23          CHIEF DEPUTY CLERK BUCKSON:  Juror No. 3, having

24 heard the verdict delivered by the foreperson, is that your

25 verdict also?

1          JUROR NO. 3:  Yes.

2          CHIEF DEPUTY CLERK BUCKSON:  Juror No. 4, having

3   heard the verdict delivered by the foreperson, is that your

4   verdict also?

5          JUROR NO. 4:  Yes.

6          CHIEF DEPUTY CLERK BUCKSON:  Juror No. 5, having

7   heard the verdict delivered by the foreperson, is that your

8   verdict also?

9          JUROR NO. 5:  Yes.

10          CHIEF DEPUTY CLERK BUCKSON:  Juror No. 6, having

11   heard the verdict delivered by the foreperson, is that your

12   verdict, also?

13          JUROR NO. 6:  Yes.

14          CHIEF DEPUTY CLERK BUCKSON:  Juror No. 7, having

15   heard the verdict delivered by the foreperson, is that your

16   verdict also?

17          JUROR NO. 7:  Yes.

18          CHIEF DEPUTY CLERK BUCKSON:  Juror No. 8, having

19   heard the verdict delivered by the foreperson, is that your

20   verdict also?

21          JUROR NO. 8:  Yes.

22          THE COURT:  Thank you, Mr. Buckson.

23          The jury having been polled and having

24   reaffirmed that their verdict is unanimous, I will direct

25   the verdict be recorded.

1                    On behalf of the Court and the parties, thank

2       you, ladies and gentlemen.  You are hereby dismissed.

3                    Thank you very much.

4                    (At 4:34 p.m. the jury was dismissed.)

5                    Counsel, what I would like you to do is take a

6       little time, decompress, and discuss a schedule for

7       posttrial matters and just submit a stipulation, and I will

8       endorse the stipulation.

9                    Any other matters that we need to discuss at

10      this point?

11                   I would like to see Mr. Wille and Mr. Ryan off

12      the record at sidebar.

13                   (Sidebar conference not reported.)

14                   (Trial concluded.)

15                              -   -   -

16

17

18

19

20

21

22

23

24

25