## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SURGIQUEST, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 14-382-GMS |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| LEXION MEDICAL, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## LEXION MEDICAL'S REPLY IN SUPPORT OF ITS MOTION FOR PERMANENT INJUNCTION, DISGORGEMENT OF PROFITS, ATTORNEYS FEES, PREJUDGMENT INTEREST, AND POST JUDGMENT INTEREST

OF COUNSEL:

David G. Wille
Paul J. Reilly
Megan LaDriere
BAKER BOTTS LLP
2001 Ross Avenue
Dallas, TX  75201-2980
Tel:  (214) 953-6500

David E. Moore (#3983)
Bindu A. Palapura (#5370)
Hercules Plaza, 6th Floor
POTTER ANDERSON & CORROON LLP
1313 N. Market Street
Wilmington, DE  19801
Tel:  (302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com

*Attorneys for Defendant Lexion Medical, LLC*

Dated:  July 6, 2017
5264327 / 41466

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................... 1

ARGUMENT .................................................................................................................................. 1

   I.    Injunctive Relief............................................................................................................. 1

   II.   Disgorgement of Profits ................................................................................................ 5

       1.   The *Banjo Buddies* Factors Favor Lexion....................................................... 5

       2.   Both the Deterrence and Unjust Enrichment Rationales Are Applicable Here ............... 8

       3.   SurgiQuest Failed to Meet its Burden ............................................................. 11

       4.   The Court has Discretion as to the Amount of Disgorgement ....................................... 13

   III.   Attorneys' Fees ........................................................................................................... 14

   IV.   Prejudgment and Post Judgment Interest ...................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Banjo Buddies Inc. v. Renosky*,
399 F.3d 168 (3d Cir. 2005)........................................................................................... passim

*Charles Jacquin et Cie Inc., v. Destileria Serralles Inc.*,
921 F.2d 467 (3d Cir. 1990).....................................................................................................3

*Conopco, Inc. v. Campbell Soup Co.*,
95 F.3d 187 (2d Cir. 1996).......................................................................................................5

*Covertech Fabricating, Inc. v. TVM Bldg. Prods., Inc.*,
855 F.3d 163 (3d Cir. 2017)...............................................................................................12, 13

*Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*,
774 F.3d 192 (3d Cir. 2014).....................................................................................................1

*Keurig, Inc. v. Sturm Foods, Inc.*,
C.A. No. 10-841-SLR-MPT, 2013 WL 633574 (D. Del. Feb. 19, 2013) .................................6

*Merck Eprova AG v. Gnosis S.p.A.*,
760 F.3d 247 (2d Cir. 2014)..................................................................................................7, 9

*Merck Eprova AG v. Gnosis S.p.A.*,
901 F. Supp. 2d 436 (S.D.N.Y. 2012)...................................................................................1, 6

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*,
290 F.3d 578 (3rd. Cir. 2002) ..............................................................................................2, 4

*Octane Fitness, LLC v. Icon Health & Fitness, Inc.*,
134 S. Ct. 1749 (2014)........................................................................................................14, 15

*Otis Clapp and Son., Inc. v. Filmore Vitamin Co.*,
754 F.2d 738 (7th Cir. 1985) .........................................................................................7, 13, 15

*PBM Products LLC v. Mead Johnson & Co.*,
639 F.3d 111 (4th Cir. 2011) ..........................................................................................1, 2, 3, 5

*Rexall Sundown, Inc. v. Perrigo, Co.*,
707 F. Supp. 2d 357 (E.D.N.Y. 2010) ...................................................................................6

*Safeco Ins. Co. of America v. Burr*,
127 S. Ct. 2201 (2007)..........................................................................................................10

*Sparks Tune-Up Centers, Inc. v. Panchevre*,
  No. 90C4369, 1992 WL 368057 (N.D. Ill. Dec. 3, 1992) .......................................................14

*Warner Lambert v. Breathasure*,
  204 F.3d 87 (3d Cir. 2000)....................................................................................................4

**STATUTES & RULES**

15 U.S.C. § 1117.................................................................................................................6, 12

Fed. R. Civ. P. 60...................................................................................................................12

## INTRODUCTION

For the reasons stated in this brief and its opening brief, Lexion respectfully requests that this Court (1) enter a permanent injunction against future false advertising by SurgiQuest, (2) award disgorgement of profits, (3) declare this case exceptional and award Lexion its attorneys' fees, (4) award prejudgment interest, and (5) award post judgment interest.

## ARGUMENT

### I.   Injunctive Relief

Lexion demonstrated irreparable harm due to loss of market position, harm to its goodwill and reputation, and, based upon SurgiQuest's own expert testimony, the impossibility of identifying all lost sales. (D.I. 256, hereinafter "Opening Br.," at 1-4).[1] SurgiQuest all but ignores this evidence, instead claiming that because Lexion presented a damages case, it cannot obtain an injunction and because the jury verdict does not focus on each individual statement, no injunction can be granted. SurigQuest is wrong on both accounts.

Simply because Lexion presented a damages case does not mean it has not also suffered irreparable harm or will not suffer irreparable harm in the future. *Merck Eprova AG v. Gnosis S.p.A.*, 901 F. Supp. 2d 436, 462 (S.D.N.Y. 2012) (damages award was partial compensation but irreparable harm still existed due to loss of market position); *PBM Products LLC v. Mead Johnson & Co.,* 639 F.3d 111, 127 (4th Cir. 2011) (substantial damages judgment "does not negate" right to injunctive relief, especially to prevent future harm). While Lexion proved damages for past harm due to the false advertising, that award does not protect Lexion from

---

[1] SurgiQuest mistakenly claims that Lexion relies on attorney argument. Not only has Lexion cited to the trial record, it has gone further to explain to the Court how the trial record demonstrates irreparable harm--e.g. why a change of market position causes irreparable harm, as the Third Circuit found in *Novartis.* Beyond that explanation, Lexion has pointed the Court to reasonable inferences from the evidence, a normal practice when briefing injunctions. *Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*, 774 F.3d 192, 205 (3d Cir. 2014) (critical aspect of fact-finding for injunctions is drawing reasonable inferences).

future harm arising from future false advertising as an injunction would. Contrary to SurgiQuest's contention (D.I. 258, hereinafter "SQ Brief" at 10), Mr. Andrien never testified that monetary damages could fully compensate Lexion. Even though some lost sales can be calculated, the *Novartis* case establishes that loss of market share constitutes irreparable harm, because loss of market share causes harms beyond just calculable lost sales. The evidence bears out Lexion's severe loss of market share--declining sales in a growing market. (Lex. Ex. 866, S.Q. Ex. 386, Lex. Ex. 873, Trial Tr. 807). Thus, Lexion has suffered irreparable harm. *See also PBM Products, LLC,* 639 F.3d at 126-27 (plaintiff who can prove actual lost sales may obtain an injunction even if most of the sales decline is attributable to other factors). As set forth in Lexion's opening brief (at 3-4), it has also suffered harm to its goodwill and reputation.

An injunction is also appropriate without a jury finding on each individual statement sought to be enjoined (SQ Brief at 13-14).[2] *PBM Products, LLC,* 639 F.3d at 119 & 128 (court properly "enjoined all four advertising claims" even where general jury verdict did not specify which of four statement the jury found actionable). Individual findings are not required because all of the statements sought to be enjoined from each particular bucket are false for the same reason. The heating and humidification statements are all false because the AirSeal does not do essentially the same thing as Lexion's products but instead "dehydrates the abdominal cavity . . . chilling the patient." (Joint Ex. 7 at SQ41792, D.I. 257 at pp. 21-23). Moreover, these claims are per se false because they are unsubstantiated, as demonstrated by the quoted language--the testing proves the opposite of the advertising claims. *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 590 (3rd. Cir. 2002) (unsubstantiated

---

[2] While SurgiQuest contends that the injunction must be "narrowly tailored," the injunction proposed by Lexion is exactly that. The proposed injunction focuses on those statements that SurgiQuest has used to paint a false picture of the AirSeal. SurgiQuest has not offered any way to more narrowly tailor the injunction while still preventing it from making false statements.

claims per se false).  The air statements are all false because there is no seal--the alleged

"AirSeal" allows gas to escape from the abdomen and does not prevent air from entering it.  By

proving the opposite of its advertising, SurgiQuest's own engineering specification proves these

claims also are unsubstantiated, and thus per se false.  (D.I. 257 at 23).  All of the smoke claims

are false because the AirSeal trocar leaks smoke into the operating room and does not filter out

toxic and carcinogenic gasses from the smoke.  (*Id.* at 24-25).  Mr. Tegan agrees these claims are

unsubstantiated as well and thus per se false.  (Trial Tr. 1350).  Even if the false statements

within a bucket were false for different reasons, this Court may find them false as the factfinder

so as to grant Lexion's request for an injunction.  *Charles Jacquin et Cie Inc., v. Destileria*

*Serralles Inc.,* 921 F.2d 467, 472 (3d Cir. 1990) (in crafting injunctive relief, district court

properly supplied its own factual findings to supplement jury's special verdict).

While SurgiQuest repeats its causation arguments (SQ Brief at 8-9) from its JMOL

motion, there is a significant amount of evidence demonstrating causation.  (D.I. 257 at 5-10).

The jury's award of damages required a finding of causation and thus supports an injunction.

(Trial Tr. 1712).[3]  Because SurgiQuest continues to make false claims in all three buckets, an

injunction is warranted.  (Trial Tr. 177-78, Lex. Ex. 486, Trial Tr. 625-27, Trial Tr. 1582-83, Lex.

Ex. 879, Trial Tr. 1052-53).  Lexion has previously explained how the smoke and air statements

cause harm to Lexion.  (Opening Br.at 2-3, D.I. 257 at 9).  For example, there was evidence that

certain customers made purchase decisions based upon protecting staff from the dangers of

---

[3] The jury's finding also rebuts SurgiQuest's contention that other factors caused Lexion's sales
to decline.  (SQ Brief at 10-11).  The jury found that SurgiQuest's false advertising damaged
Lexion.  Despite SurgiQuest's bluster about a few anecdotal emails, the emails all turned out to
be either untrue or insignificant incidents of the kind that occurred while Lexion's sales were
increasing.  (E.g. Trial Tr. 714-721).  SurgiQuest's false advertising is the only thing that
differed from 2012 onward to cause Lexion's sales to decline.  *Id.*  An injunction is still
appropriate even if other issues had some sales impact.  *PBM Products, LLC,* 639 F.3d at 126-27.

3

smoke. (Lex. Ex. 257, Lex. Ex. 193, Trial Tr. 582, 584, 655, 799-800). Any customer that purchased Airseal on that basis deprived Lexion of the ability to sell to that hospital. (D.I. 257, p. 9).

The balance of hardships also favors Lexion. SurgiQuest brought all the asserted hardships on itself due to its false advertising. (Opening Br.at 4-5). SurgiQuest ignores the *Opticians Association* case discounting any impact of self-inflicted hardships.[4] Self inflicted hardships are equally discounted when enjoining the use of a trademark, like AirSeal, that makes a false statement. *Novartis,* 290 F.3d at 596 (enjoining use of product name and discounting harm as "self inflicted") *see also Warner Lambert v. Breathasure,* 204 F.3d 87, 97 (3d Cir. 2000) (enjoining use of Breathasure trademark). Meanwhile, Lexion has seen its sales plummet and SurgiQuest has indicated it will probably put Lexion out of business. (D.I. 257 at 5-10, Trial Tr. Ex. 320). The balance of hardships is heavily tilted in Lexion's favor.

With respect to the public interest, SurgiQuest cites no evidence that changing its advertising will change the availability of the products. SurgiQuest's contention that Lexion failed to cite evidence concerning patient safety is unreasonable given that the Court sat through a seven day trial where there was ample evidence that SurgiQuest's false advertising impacted the safety of patients and operating room staff, all issues known to SurgiQuest. (Trial Tr. 154-57, 340-41, 356-67, 376-81, 392-94, 397-98, 478-79, 490-91, 681, 682-84, 688-89, 692, 695, 808-10,

---

[4] As for SurgiQuest's claim that "stable pneumoperitoneum" is a standard term, there was no documentary support for that assertion. SurgiQuest told the world that this term meant no gas escaped from the abdomen, which is untrue. (D.I. 257 at 9-10). SurgiQuest cites SQ Ex. 187, but that document does not refer to the phrase "stable pneumoperitoneum" and the characteristics of the peritoneum listed demonstrate that pneumoperitoneum is not stable with respect to these characteristics for the Airseal product. (Trial Tr. 570-71) (infection, flammability, and absorption are chemical effects of insufflation gas--those are impacted by the presence of air as discussed at Trial Tr. 360, 681, 887). Even if "stable pneumoperitoneum" was a "standard" term, SurgiQuest cannot use it to describe the AirSeal system because it is false.

4

839-45, 856-57, 858-59, 1084-88, 1096-97, 1145, 1276, 1366-68, 1429-30, Lex. Exs. 1, 21, 24, 37, 48, 55, 71, 118, 120, 168, 173, 197, 248, 322, 366, 414, 465, Joint Exs. 7, 54, 66, SQ Ex. 28); *See Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 194 (2d Cir. 1996) (public interest significant when health and safety concerns are implicated); *PBM Products LLC,* 639 F.3d at 127.

## II.    Disgorgement of Profits

### 1.    The *Banjo Buddies* Factors Favor Lexion

SurgiQuest's incredible claim that it did not intend to confuse customers emphasizes the need to deter SurgiQuest by awarding disgorgement.  First, the jury found intentional or willful false advertising and that SurgiQuest intentionally or recklessly engaged in unfair competition. (D.I. 249-1 at Quest. 5 & 7).  Second, as explained elsewhere (D.I. 257 at 21-25), all three categories of false advertising involved statements SurgiQuest knew were false and continued to make even after Lexion accused SurgiQuest of false advertising.  Moreover, for all three categories, Lexion presented evidence that SurgiQuest knowingly trained sales representatives using false information.  *Id.*[5]  SurgiQuest's assertion (SQ Brief at 6, 9, 17-18) that these were isolated statements of a few rogue sales reps is pure fantasy.  While Lexion presented evidence that the sales reps were trained with false information and instructed to make false statements to customers, SurgiQuest did not present the testimony of a single sales representative to the contrary.

As to the second factor, SurgiQuest's position is inconsistent with the jury verdict.  The

---

[5] SurgiQuest's reliance (SQ Brief at 18) upon the instructions for use is likewise misplaced for multiple reasons, including that those instructions themselves contain false statements.  (D.I. 257 at 24, n. 9).  Also erroneous is SurgiQuest's contention that it relied in good faith on its internal humidity testing.  (SQ Brief at 18).  It made unsubstantiated claims without testing.  (D.I. 257 at p. 22).  SurgiQuest's later testing and statements to the FDA reveal that SurgiQuest knew all along that the Airseal did not do essentially the same thing as Insuflow and did not keep tissues moist.  (D.I. 257 at 21-22).  Ralph Stearns's test confirmed that Airseal dehydrates and chills the patient--conclusively proving the advertising false, not substantiating it.  (Joint Ex. 7 at SQ41792).  This test could not support SurgiQuest's advertising claims.  (Trial Tr. 395-401).

jury was instructed, as discussed above, that harm to Lexion must be found to award damages (Trial Tr. 1705 & 1712).  The jury necessarily found that Lexion was damaged as a result of the false advertising.  Not only do its arguments contradict the verdict, SurgiQuest does not address the evidence of specific lost accounts resulting from SurgiQuest's false advertising.  (Opening Br. at 8).  Lexion's response to SurgiQuest's JMOL motion addresses SurigQuest's causation arguments.  (D.I. 257, at 4-10).[6]  There is ample evidence sales were diverted.  SurgiQuest's alternative explanations (SQ Brief at 18) for declining revenues were either inaccurate or were simply insignificant typical events of the kind that occurred before SurgiQuest started its false advertising in 2012 and had not changed materially since that time.  (E.g. Trial Tr. 714-721).

As to the third factor, SurgiQuest's argument is inconsistent because it argues that Lexion should not recover any lost profits in its JMOL motion.  But, a 12.2 million dollar award is nevertheless inadequate.  The statute explicitly allows for the recovery of both lost profits and disgorgement.  15 U.S.C. § 1117.  Simply because Lexion recovers some damages does not make the remedy adequate.  The policy considerations behind disgorgement--both deterrence and preventing unjust enrichment--make a 2.2 million dollar compensatory award and state punitive damages award inadequate.  SurgiQuest made over 100 million dollars in sales and, by doing so, established customer relationships that will result in the sale of hundreds of millions of dollars of products in the future. *See Merck Eprova AG*, 901 F. Supp. 2d at 460 (awarding disgorgement for sales likely to occur due to initial deception).  SurgiQuest will not be deterred a bit by a mere

---

[6] SurgiQuest suggests that Lexion must show the amount of SurgiQuest profits attributable to the false advertising. (SQ Brief at 6).  But SurgiQuest is wrong.  The statute requires the defendant to prove any proportion of total profits that may not be attributed to wrongful conduct. *Keurig, Inc. v. Sturm Foods, Inc.,* C.A. No. 10-841-SLR-MPT, 2013 WL 633574 (D. Del. Feb. 19, 2013) (citing *Banjo Buddies*); *see also, Rexall Sundown, Inc. v. Perrigo, Co.*, 707 F. Supp. 2d 357, 359-63 (E.D.N.Y. 2010) (defendant bears burden of showing amount of profits attributable).  SurgiQuest failed to present any expert testimony even attempting to meet its burden and did not perform such calculations.

12.2 million dollar award.  And a 12.2 million dollar award in no way causes a company sold for $265 million to forfeit its unjust enrichment.  SurgiQuest does not refute the *Merck* case analysis that uncertainty of winning back customers in the future justifies disgorgement.[7]

As to the fourth factor, SurgiQuest's argument is misleading.  Lexion's initial pleading indicated that SurgiQuest had falsely advertised Airseal.  While specific facts were included for the heating/humidification claims as an example, the pleading was general and provided sufficient notice to SurgiQuest of Lexion's claims.  (D.I. 8, paras. 36-46).  SurgiQuest understood this because it then served an interrogatory asking Lexion to identify all false statements.  (Wille Declaration Ex. A).  Lexion's first response to that interrogatory in February, 2015 listed air and smoke false advertising statements.  (Wille Declaration Ex. A).  While the false advertising began in 2012, Lexion first tried to resolve the dispute with a letter.  (Lex. Ex. 197).  While SurgiQuest contends that the letter concerned a different statement, that statement was of the same nature of those proven false at trial.  Lexion cannot be penalized under this factor for trying to resolve the dispute without litigation.

On the fifth factor of making the misconduct unprofitable, the jury's damage award in no way makes unprofitable conduct that led to SurgiQuest being sold for $265 million.  SurgiQuest does not deny that these concerns are heightened because the public has an interest in protecting patient safety and discouraging interference with the consumer's ability to make informed purchasing decisions.  (Opening Br. at 9).  SurgiQuest surprisingly complains about the absence

---

[7] SurgiQuest's arguments on market share (p. 19) seem to focus on whether the 2.2 million in damages was an accurate amount of damage for Lexion.  But that is not the issue when considering disgorgement.  The policies underlying disgorgement focus on whether the compensatory award is sufficient for purposes of deterrence and preventing unjust enrichment. The law supports any resulting windfall for the plaintiff, if any.  *Banjo Buddies Inc. v. Renosky*, 399 F.3d 168, 178; (3d Cir. 2005); *see Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 261 (2d. Cir. 2014) (deterrence rationale is not compensatory).  The goal is to make the Lanham Act violation unprofitable.  *Banjo Buddies*, 399 F.3d at 178; *Otis Clapp and Son*, 754 F.2d at 744.

7

of record cites to the ample evidence of endangering patient safety, but there was plenty of evidence with respect to all three categories of false advertising as noted above. SurgiQuest's arguments on causation and that the false advertising was sporadic are both addressed above. Finally, FDA approval is irrelevant to the issue of patient safety because the FDA was not given all material information and SurgiQuest removed a safety feature after approval. (Trial Tr. 335-37, 1136-45, 1549-51, 1557-62 Joint Exs. 5, 6, 34, 70, 243, SQ Ex. 246). Moreover, if the FDA were infallible, there would not be product liability medical device lawsuits.

### 2. Both the Deterrence and Unjust Enrichment Rationales Are Applicable Here

SurgiQuest contends on the one hand that none of its false advertising, which the jury found was worthy of compensatory and punitive damages, merits an injunction, yet then contends that there is no need to award disgorgement damages for deterrence purposes. SurgiQuest's desire to be able to continue to make false statements without being enjoined from doing so, standing on its own, both justifies disgorgement of profits for deterrence purposes and demonstrates that SurgiQuest has not heard the jury's message.

SurgiQuest's meritless legal claims against Lexion demonstrate further justification for deterrence beyond SurgiQuest's willful false advertising and its stated desire in post-trial briefing to continue deceiving customers. When Lexion provided information to the marketplace demonstrating (1) that the Airseal sucked air into the abdomen as demonstrated by laboratory testing (Joint Ex. 83), and (2) that the Airseal had higher rates of complications than competing products (Lex. Ex. 867), SurgiQuest did not cease its willful false advertising. Not only did it double down by continuing to confuse the marketplace, it went further in an attempt to cover up its wrongdoing--SurgiQuest amended its pleadings to make public allegations that Lexion's statements were false. (D.I. 152, para. 45-51). The jury rejected one of those claims and SurgiQuest did not even bring the claim about air entrainment to trial.

8

SurgiQuest argues that deterrence does not make sense in view of the acquisition by Conmed. (SQ Brief at 16). But it was Conmed's lawyers, who first appeared after the acquisition was complete in February, 2016 (D.I. 93-95, Trial Tr. 1038), that amended the pleadings to publicly accuse Lexion of misleading customers about AirSeal. (D.I. 152). Thus, Conmed took active steps to cover up SurgiQuest's false advertising when Lexion tried to warn the marketplace about air entrainment and increased complication rates. Conmed continued to make meritless false advertising claims regarding heating and humidification as well. (D.I. 152 at paras. 29-44). Conmed used its amended complaint to try to send a message to the marketplace that Lexion was making things up. Conmed needed to make money for the shareholders. (Trial Tr. 1028). Moreover, rather than firing SurgiQuest's management who was heavily involved in formulating the false messages to the marketplace, Conmed made Mr. Azarbarzin a Chief Technology Officer (Trial Tr. 1098), made Mr. Tegan a Senior Director of strategic and clinical development (Trial Tr. 1286), and made Mr. Babini a Vice President (Trial Tr. 760). And while SurgiQuest did not produce in discovery 2016 emails from sales reps, there was still evidence of false advertising after the acquisition by Conmed. (Trial Tr. 177-78, Lex. Ex. 486, Trial Tr. 625-27, Trial Tr. 1582-83, Lex. Ex. 879, Trial Tr. 1052-53).

Not only is *Merck Eprova* on point, the facts here are worse. As discussed above, SurgiQuest has had notice of the substance of all of Lexion's claims since February, 2015. Lexion's letter (Lex. Ex. 197), while not focused on the verbatim statements addressed at trial, complains about assertions that a heater/humidifier is not needed and creating the impression that Airseal can heat and humidify--in essence the claims addressed at trial. SurgiQuest targeted Lexion's customers with an unsubstantiated false message that it did exactly the same thing. (D.I. 257 at 21-23). Later, its own testing proved that AirSeal did the opposite of Insuflow--yet

9

its advertising continued.  (*Id.* at 21).  SurgiQuest trained its sales reps with false information in all three false advertising categories.  (D.I. 257 at 22-25).  And when Lexion tried to expose the truth, SurgiQuest sued Lexion for false advertising (D.I. 152) to attempt to cover up its wrongdoing and performed misleading demonstrations for customers to convince them no air could get sucked into the abdomen.  (D.I. 257 at 23).  They even went so far as to say they would put Lexion out of business.  (Trial Tr. 621-23 Lex. Ex. 320).  SurgiQuest did all these things while endangering the safety of patients and surgical staff with their false advertising.

In the discussion of the first *Banjo Buddies* factor discussed above, and in its brief in response to JMOL (D.I. 257 at 21-25), Lexion has refuted SurgiQuest's contentions that disgorgement is not warranted due to intentional or willful conduct.  (SQ Brief at 16-17).[8]  It is hard to imagine a stronger case for the deterrence rationale to apply.

Unjust enrichment is also a basis for disgorgement.  Many of the same facts justifying an award for deterrence purposes justify an award for unjust enrichment--particularly the targeting of Lexion's customers.  SurgiQuest's sales resulted from false advertising.  SurgiQuest touted heating and humidification, smoke evacuation to protect the operating room staff, and maintaining stable pneumoperitoneum--perhaps best summed up by Lex. Ex. 133, that a SurgiQuest sales rep described as his "standard" email with bullets provided to him by

---

[8] SurgiQuest wrongly contends that the Court should not consider the finding of intentional or reckless unfair competition as it concerns a state law claim.  But the jury's finding establishes that SurgiQuest acted intentionally or recklessly--in other words their conduct was willful. *See Safeco Ins. Co. of America v. Burr*, 127 S. Ct. 2201, 2208 (2007) (willfulness includes knowing or reckless violations).  That is a relevant factual conclusion to consider regardless of what cause of action it concerns given the factual overlap supporting liability for each cause of action.  That the jury received no instruction on willfulness is irrelevant.  The jury made a finding on willfulness--which simply means knowing (the plain meaning of the term) or reckless.  So brazen was SurgiQuest's conduct here, the jury found willfulness without an instruction that a lesser showing of recklessness would have been sufficient.  Also, wrong is SurgiQuest's contention that a single statement by a sales rep could have resulted in the willfulness finding.  The jury instructions required much more than a single statement.  (Trial Tr. 1701).

10

SurgiQuest.  (Trial Tr. 639-41, Trial Tr. 978).  But of course Airseal does not heat and humidify or keep tissues moist.  (D.I. 257 at 21-22).  And Airseal does not protect the staff from surgical smoke.  (*Id.* at 24-25).  While SurgiQuest's witnesses touted "stable pneumoperitoneum" as a key feature they advertised (indeed the "number one" differentiating feature), (Trial Tr. 1053, 1115, 1296, 1298, 1301, Lex. Ex. 9), SurgiQuest itself defined that term to the marketplace as meaning that no gas could escape during a procedure.  (Lex. Ex. 207).  That of course was false and the escaping gas could result in as much as 70% air in the abdomen.  (D.I. 257 at 23).  Yet when Lexion revealed this key feature as false, SurgiQuest went out of its way to conceal the truth.  (D.I. 257 at 23-24).  To say SurgiQuest's enrichment from its conduct was "unjust" is an understatement.[9]  Had the false claims of "stable pneumoperitoneum" not been a key claim in selling the product, there would have been no reason to conceal the truth.

### 3.    SurgiQuest Failed to Meet its Burden

With respect to disgorgement of profits, SurgiQuest had the burden to prove all elements of cost or deduction claimed from its gross sales.  (Opening Br. at 9).  To attempt to do so, SurgiQuest relied on Mr. Ugone's testimony.  But SurgiQuest does not deny that Mr. Ugone (a) used an improper methodology relying upon the balance sheet as a whole rather than focusing on sales, costs, and expenses specifically attributable to the Airseal system (*Id.* at 10), (b) presented conclusory testimony that improperly lumped costs into broad categories with no explanation of what specific expenses those categories represented (*Id.* at 10-11), (c) had no record evidence

---

[9] SurgiQuest's statement (SQ Brief, at 15) that Lexion's sales were much smaller is misleading. SurgiQuest's sales dollars are inflated by insufflator sales.  In 2013, as the false advertising began to damage Lexion, Lexion's products were used in approximately 173,000 procedures (total number of disposables sold) and that number had been increasing every year.  (Lex. Ex. 873, at 3, Lex. Ex. 866).  SurgiQuest did not exceed this number of procedures in 2013-2015, doing so only in 2016.  (Lex. Ex. 873, at 3).  SurgiQuest's market share argument (SQ Brief at 18-19) is equally misleading because Lexion had a greater market share of surgical procedures until 2016--after 3.5 years of declining Lexion sales due to false advertising.

11

supporting what was on his Power Point slide for 2016 (*Id.* at 11), and (d) presented broad categories of deductions that no doubt include numerous costs and expenses that are inappropriate to deduct from gross sales. (*Id.* at 12-14).

With no reasonable argument that Mr. Ugone's analysis satisfies its burden, SurgiQuest tries to excuse its failure to meet its burden by arguing that Lexion has somehow waived its right to demonstrate the flaws in Mr. Ugone's analysis by failing to cross examine him as to those flaws. (SQ Brief at 20-22).[10] But this wrong. This Court is the factfinder with respect to disgorgement of profits, constrained only by the statute and the findings of the jury on other issues. As factfinder, the Court is free to reject any expert opinions, particularly those that rely upon a flawed methodology. Lexion's only burden under 15 U.S.C. § 1117 was to prove gross sales. Once it did so, SurgiQuest had the burden of proving and justifying each item of expense and deduction claimed. Because SurgiQuest failed to do so, it failed to meet its burden no matter whether Lexion pointed that out on cross examination or not. SurgiQuest cites no authority that a party must expose the flawed methodology of an expert on cross examination. Rather, Lexion asks the Court to reject Mr. Ugone's analysis as flawed just as the district court did in *Banjo Buddies Inc.*, 399 F.3d at 176-77 (affirming rejection of expert report's cost analysis based upon flaws identified by the district court in the analysis).

SurgiQuest also protests that its damages expert, Mr. Ugone, merely summarized detailed findings in his expert report. There are two problems with this argument. First, his expert report is not in evidence. An analysis of profits for disgorgement should be based upon evidence in the record. *Covertech Fabricating, Inc. v. TVM Bldg. Prods., Inc.*, 855 F.3d 163, 177 (3d Cir. 2017). Second, if the Court had Mr. Ugone's report, it would see that only a single paragraph of that

---

[10] The only case SurgiQuest cites for this proposition is *Kroblin,* an inapplicable case that concerns failure to raise a Rule 60 choice of law argument at trial.

12

report, paragraph 115--10 lines long, addresses the issue of deduction of expenses from total profits. That paragraph references Exhibit 15, which appears to match SQ Ex. 386. Mr. Ugone's expert report is just as flawed as his trial testimony.

Finally, SurgiQuest is also wrong (SQ Brief p. 20) when it contends that the Court should not consider Lexion's calculations of net profits presented in its brief because they were not presented at trial. Again, Lexion's only burden was to present gross sales. SurgiQuest had the burden of providing deductible costs from those gross sales and failed to do so. The Third Circuit has recently made clear, citing the example of *Banjo Buddies*, that when a defendant fails to meet its burden, a court should, rather than awarding gross profits, make "a reasonable *estimation* of actual profits." *Covertech*, 855 F.3d at 177 (emphasis added). It should ground its estimate in the record, using, for example business records. *Id.* Thus, Lexion was not required to have an expert make the calculations it makes in its brief. Lexion's calculations are a "reasonable estimation" of actual profits using business records in the record. In other words, Lexion has tried to assist the Court to do exactly what the Third Circuit has said it must do when SurgiQuest fails to meet its burden. And Lexion's calculations are not complicated--they are simple multiplications and divisions taken directly from the business records--the kind of calculation the Third Circuit entrusts district courts to make.

### 4. The Court has Discretion as to the Amount of Disgorgement

SurgiQuest does not dispute any of the calculations that Lexion provides in its brief at pages 15-16, and 20-21. Nor does SurgiQuest dispute that if the Court awards an amount for disgorgement, an award for 2017 is appropriate. (Opening Br. at 20-21). "The trial court's primary function is to make violations of the Lanham Act unprofitable to the infringing party." *Otis Clapp and Son., Inc. v. Filmore Vitamin Co.,* 754 F.2d 738, 744 (7th Cir. 1985). Thus, this Court has discretion to award the amounts set forth on p. 21 of Lexion's opening brief as a

"reasonable estimation" of actual profits based upon the evidence in the record, the findings of the jury, and the caselaw disallowing deductions discussed by Lexion in its opening brief.  A startup company losing money would be an example of a situation where it is appropriate to make a reasonable estimation of profits for disgorgement purposes.  This is an appropriate case for such an award and Lexion requests the Court to exercise its discretion.

SurgiQuest contends that the Court should not use Lexion's profit margin for a disgorgement calculation because SurgiQuest was a startup company.  (SQ Brief at 22).  None of the trial transcript citations indicate that SurgiQuest's lack of profit is a result of R&D or clinical testing, as claimed.  Moreover, the product was launched by the time the false advertising began so there was no more research and development to do.  (Trial Tr. at 1290).  But even if SurgiQuest could tie a lack of profits on paper to the fact it was a startup, that is irrelevant under the caselaw relied upon by Lexion--an estimate of profits may be awarded even where the defendant lost money.  (Opening Br. at 17-18).  *Sparks Tune-Up Centers, Inc. v. Panchevre*, No. 90C4369, 1992 WL 368057, at *3-4 (N.D. Ill. Dec. 3, 1992) (awarding profits against defendant startup business).  This is an especially appropriate case to do so because the false advertising created a revenue stream that led to a $265 million acquisition--which was SurgiQuest's goal all along.  (Opening Br. at 18).  Startup companies that pump up their sales to get acquired should not be immune from disgorgement of profits--they profit in a different way.

### III.    Attorneys' Fees

SurgiQuest is off base in contending that "Lexion argues exceptionality based on being the prevailing party."  (SQ Brief at 23).  Instead, Lexion demonstrated how this case was exceptional even under the harsher standard predating *Octane Fitness.*  (Opening Br. at 22-23).  The jury found that SurgiQuest's conduct merited punitive damages.  It is hard to imagine any

14

case where punitive damages were appropriate that is not a case that "stands out from others with respect to the substantive strength of a party's litigating position." *Octane Fitness, LLC v. Icon Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014). Lexion's explanation of the appropriateness of punitive damages demonstrates why the facts of this case stand out from others. (D.I. 257 at 21-25); *see, e.g.*, *Otis Clapp and Son., Inc.*, 754 F.2d at 746 (fees awarded where defendant targeted plaintiff). The jury's finding matters regardless of which legal claim the award was provided under, given the overlap in the relevant facts for each claim. That the willfulness question was mistakenly placed under a heading on deceptive trade practices, where the question is irrelevant, makes no difference either--the jury found willful false advertising.

As to SurgiQuest's own claims, SurgiQuest does not deny that its claim was not actionable under the Lanham Act because it concerned something that was a matter of judgment, not an issue of fact. (Opening Br. at 24). Even Conmed's executive indicated that if this claim were valid, he would have been informed, but he was not. (Trial Tr. 1047). SurgiQuest further contends that its failure to present other meritless claims to the jury is somehow analogous to Lexion failing to present some of the false advertising statements. But there is a big difference. SurgiQuest failed to present entire categories of false advertising claims. Lexion simply narrowed the list of false statements within each category of claims--claims which the jury found were all meritorious. This is an exceptional case and Lexion requests an award of attorneys' fees.

## IV.    Prejudgment and Post Judgment Interest

Because this case is exceptional, Lexion requests an award of prejudgment interest. Lexion agrees with SurgiQuest that such interest would only apply to the compensatory award. With respect to postjudgment interest, SurgiQuest does not deny an award is appropriate with respect to any damages award. Lexion thus requests an award of both types of interest in an amount to be determined based upon the final award of compensation awarded.

15

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

David G. Wille
Paul J. Reilly
Megan LaDriere
BAKER BOTTS LLP
2001 Ross Avenue
Dallas, TX  75201-2980
Tel:  (214) 953-6500

By:  */s/ David E. Moore*
    David E. Moore (#3983)
    Bindu A. Palapura (#5370)
    Hercules Plaza, 6th Floor
    1313 N. Market Street
    Wilmington, DE  19801
    Tel:  (302) 984-6000
    dmoore@potteranderson.com
    bpalapura@potteranderson.com

Dated:  July 6, 2017
5264327 / 41466

*Attorneys for Defendant Lexion Medical, LLC*

16